■ MAXIM GERSHUNOFF, Appellant-Respondent, v VALERY PANOV et al., Respondents-Appellants.—Judgment, Supreme Court, New York County, entered July 5, 1979, after Bench trial, modified, on the law and the facts, and in the exercise of discretion, to grant the application to increase the *ad damnum* clause of defendant-respondents-appellants' counterclaim from $112,500 to $255,500, to conform the pleading to the proof, and, applying thereto a setoff of $18,826.10, to direct judgment on the counterclaim in favor of defendants-respondents-appellants against plaintiff-appellant-respondent for $236,673.90, with interest, costs, and disbursements, and otherwise affirmed, with costs and disbursements of this appeal to be paid (one bill) by plaintiff-appellant-respondent to defendants-respondents-appellants. Defendants, husband and wife, well-known ballet artists, emigrated from Russia to Israel in 1974, amid much newspaper publicity. Since they were, in the argot of the profession, a "hot property", capable of attracting many offers of engagement, they were sought out by plaintiff, himself well known in the field, as both a manager and an impresario. Defendants knew only the Russian language; plaintiff was fluent in Russian, his native tongue, and well schooled in English. He was expert in the ways of the Western world, particularly with the ins and outs of show business deals; defendants, fresh from a mileu where everything, inclusive of the performing arts, is operated by the State, were untaught babes in a world where freedom exists as well for the blandisher and trimmer as for others. In July, 1974 in Israel, the parties entered into a contract, plaintiff being described therein as "exclusive impresario manager" for the pair of artists, to be paid a 20% commission on the fees of all their engagements to be provided by him, with fees to be negotiated between them whenever the engagement was for plaintiff's own account. Some time after this arrangement, as the couple became wiser in the world of free private enterprise, they became disgruntled with the

manner of their compensation and expressed themselves to plaintiff accordingly. He struck the first blow: accusing the artists of breach of contract, he sued at once for damage for breach and to enjoin their acceptance of engagements except through him. They counterattacked forthwith, counterclaiming for an accounting of receipts of their engagements, as well as the value of engagements he had had the opportunity to provide for them but as to which he had not communicated these opportunities to his clients, as well as for misconduct generally in his fiduciary capacity. There was a Bench trial before (now retired) Justice Samuel Rosenberg. An excerpt from his decision of December 22, 1976 conveys the flavor of the relationship which, at first unknown to defendants, had existed between the parties: "Shortly after this agreement was made, the initiation of the Panovs into the ways of the western world of business commenced with plaintiff wearing two hats and acting in a dual capacity. Evidence was adduced at trial, by those with impressive credentials, experience and repute in the field, that a manager of an artist undertakes to promote the artist and obtain engagements for him for a commission which ranges customarily from 10% to 20%. An impresario, however, occupies a different status akin to a producer of events, and undertakes to pay the artist an agreed upon fee, produce the event at his risk, and retain as his compensation whatever profits are engendered. The credible proof adduced indicates that plaintiff sought to obtain the benefits accruing to both positions, while not being burdened with their risks. Thus in November, 1974, at plaintiff's behest, the Panovs agreed in writing to perform in Philadelphia and Washington on certain dates for a fee of $10,000. for each performance, and to pay plaintiff a 20% commission on their earnings from each engagement. Plaintiff failed to inform them that he had entered into an agreement with Spectrum, the Philadelphia producer, whereby $25,000. was to be paid for this their premier performance. This contract was signed by the plaintiff as manager. He even received an advance of $12,500. for this Philadelphia engagement. While plaintiff has argued that he bore the risks of an impresario with respect to the expenses of the productions, examination of these two contracts reveals that the exposure of plaintiff was minimal at best, and nonexistent, in all likelihood. By seeking to obtain both the impresario's profit and the manager's commission, without full and fair disclosure, plaintiff has forfeited the right to both. It is unnecessary, for the purpose of this decision, to consider whether plaintiff's obligations to the Panovs were greater than normal by reason of their unique status as recent emigrees, their inability to speak and read English, their unfamiliarity with business and the language of the agreement, their lack of independent legal representation, and plaintiff's contrasting expertise in these areas. Considering only the facts established, and specifically the non-disclosure of plaintiff's arrangements for the Philadelphia and Washington engagements, his having been paid in advance a sum greater than that which he would pay the Panovs, plaintiff's failure to abide by the requirements of his own contract in not discussing all fees when he was to act as impresario, his failure to disclose these arrangements even when disclosure was demanded, all evidence clear violation by plaintiff of the most minimal obligations imposed upon an agent who acts for his principal. If one adds to the above the positive acts of concealment and misrepresentation to which defendants testified, plaintiff's blatant disregard of all obligations becomes even more egregious." Obviously, such conduct is entirely incompatible with the duty owed by manager Gershunoff to his principals, the Panovs. (See *Lamdin v Broadway Surface Adv. Corp.,* 272 NY 133, 138-139; *Murray v Beard,* 102 NY 505, 508-509.) By reason of this and

similar double dealing, Justice Rosenberg directed dismissal of the complaint, and a reference for "accounting and like relief", obviously to cover not alone failure to pay the couple their proper share of moneys from the engagements but also to survey the list of engagements, knowledge of which had been withheld from defendants, thus depriving them of earnings therefrom, and to ascertain the damage flowing from such faithless conduct, inconsistent with the fiduciary quality of the agency. Seemingly paradoxically, the court found no evil motivation, apparently not conceiving greed to be such, and dismissed a claim for punitive damages, explaining that "it appears that plaintiff's acts were based upon his belief that he was entitled to all he could get." The court directed that plaintiff be permitted offset against the amount which would be established before the Referee to the extent of plaintiff's legitimate expenses. Before judgment could be settled, as the decision had directed, Justice Rosenberg retired, and the judgment was entered January 14, 1977 by Justice Grossman, faithfully following Justice Rosenberg's decision.[1] Pursuant to the judgment entered on Justice Rosenberg's decision, a hearing proceeded before the Referee who, after extensive evidence, found that defendants' damage resulting from plaintiff's misconduct amounted to $255,500, less the offset.[2] When it appeared during the hearings that the extent of damage in dollars resulting from plaintiff's misconduct was far more than had been known, defendants' counsel indicated that he would be impelled to apply for increase of the *ad damnum* and to amend the complaint. He was frustrated from going further by the Referee's immediate disclaimer of authority to do anything about it, his task being merely, as to dollar amount, to report to the court what he had found from the evidence, and how he had calculated it. From this he deducted expenses, as the first Justice had indicated; this was apparently not noted in the second Justice's decision of the motion to confirm and presumably ignored. There was no basis for not granting the offset, and we restore it. Plaintiff claims that the reference should have been confined to the accounting, with no consideration of the damage factors. Indeed, on the motion to confirm the Referee's report, plaintiff cross-moved to "correct" the January 14, 1977 judgment by striking everything but the accounting and eliminating the reference's broad scope. We affirm denial of that motion. For one thing, this was an amorphous mass of undefined fraud when first encountered, without any real detailing of its components, and required careful examination and dissection. For another, as the court noted, plaintiff never submitted a counterjudgment on settlement, and even suffered the appeal therefrom to be dismissed. The counterclaim gave complete notice of defen-

---

1. Appeal from that judgment was dismissed by the Appellate Division four months later for failure to perfect timely.

2. Of this, $12,500 had earlier been found to be unpaid fruits of the Philadelphia-Washington engagement. A good part of the balance related to matter gleaned from plaintiff's file of correspondence relating to offers of engagement for defendants, never transmitted to or discussed with them. The papers were then divided into categories ranging from matters under negotiation through firm offers to, finally, actual engagements arranged for, and each carefully evaluated after considering such things as conflicts, scheduling, and other factors, as though each, taking into account all pertinent information, and after elimination of those not possible of really coming to fruition, would actually ripen into contract. In considering this figure, we also bear in mind that plaintiff, suing defendants for commissions he would lose because of their claimed breach, valued them at $1,500,000!

dants' intentions in contesting the case. So much for the scope of the reference. There was complete opportunity for cross-examination and evaluation of testimony at the Referee's hearing, and the factual results deserved confirmation. The measure of damage and the method used to achieve that measure were both proper, in our view. Where we disagree with Special Term is as to the refusal to permit amendment of the *ad damnum*. If plaintiff was prejudiced, it was his own doing, he having created the morass which required deep digging to ascertain the extent of his depredations, the knowledge of which was essential even for a claim to be asserted. The earliest opportunity defendants had to ask the court for this enlargement was at the motion to confirm the Referee's report, and it was availed of. The dollar value was not known until the Referee had decided. And, as to being a belated application, it was made before "verdict" as that term must be understood in the contest found here: there could be no verdict until the court ruled on the Referee's report. There was only one trial, and that ruling was where it ended. As a matter of discretion, the motion should have been granted, as should the concomitant motion to conform pleading to proof. (See 3 Weinstein-Korn-Miller, par 3017.05; CPLR 3025, subd [c]; 3017, subd [a].) The net effect of what we have done is to insure substantial justice, i.e., that defendants may be made whole for the damage occasioned by plaintiff's fiduciary breach. Concur—Sandler, J. P., Sullivan, Markewich and Bloom, JJ.