**Michael Trent REZNOR, Plaintiff,**

v.

**J. ARTIST MANAGEMENT, INC., John
A. Malm, Jr., Richard Szekelyi, and
Navigent Group, Defendants.**

No. 04 CIV. 3808(JSR).

United States District Court,
S.D. New York.

April 22, 2005.

Zia F. Modabber, Steven Eric Shiffman, Daniel A. Platt, Katten Muchin Zavis Rosenman, New York, NY, for Plaintiff.

Michael Francis Lynch, Martin Clearwater & Bell, LLP, New York, NY, for Richard Szekelyi, Navigent Group, defendants.

Alan N. Hirth, Debra Jean Horn, Kennee B. Switzer, Meyers, Roman, Friedberg & Lewis, Cleveland, OH, for John A. Malm, Jr., J. Artist Management, defendants.

## MEMORANDUM ORDER

RAKOFF, District Judge.

This case derives from the fifteen-year professional relationship between plaintiff Michael Trent Reznor, the lead singer in the rock band Nine Inch Nails ("NIN"), and defendant John A. Malm, Jr., Reznor's long-time manager—a relationship that ended in cacophony and discord in late 2003. Reznor charges Malm and his wholly owned management company, J. Artist Management ("JAM") with fraud, breach of contract, breach of fiduciary duty, and various other claims (ten counts in all); and Malm and JAM in turn assert eight counterclaims against Reznor. Reznor also makes six claims against Richard Szekelyi and his company, Navigent Group, accountants involved in certain of the underlying transactions.

With discovery completed, all parties now move for summary judgment. For purposes of these motions, the relevant facts are as follows: [1]

Reznor and Malm met in 1985. Deposition of John A. Malm, Jr., 9/22/04 ("Malm Dep."), at 7. Reznor was a "bit player" in a Cleveland band called the Exotic Birds, while Malm worked in his family's machine equipment business by day and by night was a part-time promoter of local music acts, including the Exotic Birds. Deposition of Michael Trent Reznor, 10/12/04 ("Reznor Dep."), at 20; Malm Dep. at 227–28. Malm caused JAM to be incorporated in Ohio in 1985, Affirmation of John A. Malm, Jr., 11/19/04, ¶ 2, but otherwise operated without much formality and, as of

---

1. Because the Court must treat certain facts differently for purposes of each party's summary judgment motion, it states where there is a dispute of consequence and construes each disputed fact most favorably to the non-moving party depending on which motion is being considered.

1989, had never managed an artist pursuant to a written management agreement. *Id.* ¶ 13. Reznor and Malm became friends, and when Reznor left the Exotic Birds and began working on his own, around 1987, Malm informally became his manager, without a written contract. *Id.* ¶ 3; Reznor Dep. at 91–92.

At first, Reznor had very little income, and Malm paid for such expenses as equipment, recording costs, and even Reznor's rent. Reznor Dep. at 92–94. However, Reznor's career took off quickly once NIN was formed. NIN performed its first show in 1988, *see* Malm Dep. at 17–18, and by later that same year had attracted interest from recording companies. JAM (through Malm) then retained an attorney, Michael Toorock, Esq., to assist in negotiating a record contract between Reznor and TeeVee Toons, Inc. ("TVT"). Declaration of Michael Toorock, 12/2/04 ("Toorock Decl."), ¶ 3. Toorock understood himself to be representing Reznor's interests and not those of Malm, who was not a party to the negotiations. *Id.* ¶ 2. However, he never talked directly to Reznor; all of his communications went through Malm as Reznor's agent. *See* Transcript, 1/10/05 ("Tr."), at 5.[2] This was in accord with Reznor's apparent practice, which was to leave such matters to various agents and professionals.[3]

In early 1989, NIN signed a recording contract with TVT, Malm Decl. ¶ 4, and its first album was released that year. Malm Dep. at 171. With Reznor starting to become successful, Malm wanted a formal management agreement, *id.* ¶ 6, and had Toorock prepare one, *id.* ¶ 7. This agreement, signed on April 20, 1989 (the "1989 Agreement"), is at the heart of the instant dispute. *See* 1989 Agreement, attached to Affirmation of Steven Shiffman in Opposition to JAM and Malm, 12/3/04 ("Shiffman Opp.-Malm Aff."), as Exhibit 1.

Malm asserts that he did not supply Toorock with any of the terms of the 1989 Agreement and that Toorock simply sent him a standard management agreement. Malm Decl. ¶ 7. Toorock, on the other hand, states that while he used as a template a management agreement relating to another client, Toorock Decl. ¶ 4, Malm specified such material terms as duration (five years) and price (a commission rate of 20 percent[4]). *Id.* ¶ 3. Toorock further avers that Malm told him that Malm and Reznor had discussed and agreed to those terms, but had not completed discussions of certain other terms, so that the draft Toorock provided was not to be the final one. *Id.*; Tr. at 4–5. Toorock says he told Malm that he was providing the draft "so that the two of them could see what a management agreement looked like," and that he did not want to come between Malm and Reznor by representing either of them as discussions continued. Tr. at 6–7. Only "years later" did Toorock discover that his draft had been signed as prepared and had become the 1989 Agreement between Malm and Reznor. Toorock Decl. ¶ 5.

In any event, it is undisputed that Reznor and Malm did not, in fact, discuss specific terms before Malm presented the 1989 Agreement to Reznor. Instead, Malm simply asked Reznor whether Rez-

---

**2.** In an attempt to clarify some of the many gaps and ambiguities in the record, the Court heard in-court testimony from Toorock on January 10, 2005. *See* Fed.R.Civ.P. 43(e).

**3.** *See, e.g.,* Deposition of Ross Rosen, 9/14/04, at 161–63; Deposition of Anthony LaPlaca, 10/5/04, at 32; Deposition of Mark Svat, 10/6/04, at 31; Deposition of Anthony Sejba, 10/13/04, at 9–10; Deposition of Anthony Flowers, 10/4/04, at 28–29.

**4.** Toorock does not, however, allege that Malm told him how the 20 percent was to be computed, *i.e.,* as a percentage of gross compensation.

nor was "open to the concept" of a management agreement and Reznor said he was. Reznor Dep. at 179. At Reznor's apartment in Ohio, on April 20, 1989, Malm showed Reznor the 1989 Agreement, explained basic terms such as the 20 percent commission, said Toorock had drawn up the contract in conformance with industry standards, and assured Reznor that, while Reznor was free to have someone else look at the contract, it was "fair." *Id.* at 179–80. Reznor says he "may have glanced through it," but because of his trust in Malm, he signed the contract right there. *Id.* at 180. Both parties agree there was no discussion of the terms that now are the subject of this litigation. *See* Malm Dep. at 175.

As noted, the 1989 Agreement had a duration of five years, during which time JAM was to receive 20 percent of Reznor's gross compensation, 1989 Agreement ¶¶ 1, 5(a). Under the Agreement, JAM was obligated to "confer with, counsel and advise [Reznor] in all matters pertaining to [his] career," including "general practices in the Entertainment Industry regarding such matters as [JAM] has knowledge, such as compensation and privileges extended for similar artistic services." *Id.* ¶ 3(a). The contract also permitted JAM to direct lawyers and accountants to work on Reznor's behalf. *Id.* ¶ 4(a). In return, JAM was to be paid its 20 percent commission on any contracts or engagements then in existence, any entered into or negotiated during the agreement's term, any extensions of such contracts, and any proceeds from any copyrights in music composed during the agreement. *Id.* ¶ 5(b).[5] JAM's commissions were to be paid "as

and when said Gross Compensation is received by [Reznor]," *id.*, and was to be payable to JAM "immediately upon payment or credit to [Reznor]." *Id.* ¶ 5(d).

In 1991, Interscope acquired Reznor's recording contract from TVT, Malm Aff. ¶ 9. As part of the transfer, new agreements were reached that obligated Reznor and NIN to record seven albums distributed by Interscope (of which, as noted, three are still to be produced). Malm Dep. at 240–41; Reznor Decl. ¶ 3. In addition, Interscope agreed to allow Reznor and Malm to form their own record label. *See* Reznor Letter of June 13, 1991, attached to JAM Defs.' Rule 56.1 Statement ("JAM Rule 56.1 Statement") as Exhibit 6. The resulting company, Nothing Records, Inc. ("NRI") was incorporated in 1993, with Reznor and Malm each owning 50 percent shares and Malm the manager. Malm Dep. at 244; Reznor Dep. at 63.

Meanwhile, as a result of NIN's growing success, Reznor and Malm created another company in 1993, J. Artist Management Merchandise, Inc. ("JAMM"), to sell the band's merchandise. *See* Action by Unanimous Consent of the Directors, attached to JAM Rule 56.1 Statement. Reznor and Malm were JAMM's sole directors. *Id.* According to Malm, Reznor had wanted to create a merchandising company as early as 1989 because he wanted tighter quality control over products associated with NIN. Malm Dep. at 686–87. Malm says the duo intended to evenly split profits derived from sales of merchandise. *Id.* at 691–92. Reznor, on the other hand, says JAMM was created at Malm's suggestion, after Malm told him other merchandising companies were not making good offers. Rez-

---

**5.** This clause is interpreted by Malm as entitling JAM to continuing commissions on Reznor's future income derived from contracts signed while the agreement was in force. The amount of money so implicated by this clause is potentially quite large, since, while the 1989 Agreement was in effect, Reznor signed

a seven-record deal with a company called Interscope Records ("Interscope"), on which he still must deliver three more albums. Malm argues that he is entitled to a 20% commission on these albums, as well as on any royalties Reznor has earned or will earn from his existing Interscope albums.

nor Dep. at 226–27. He says he never realized the profits would be split evenly, as opposed to Malm collecting his 20 percent commission. *Id.* at 13–14.

On July 20, 1993, applications for trademark registration of the name "Nine Inch Nails" and the band's logo were filed jointly on behalf of Reznor and JAM by attorney Richard Minnich, Esq. *See* 1993 Trademark Applications, attached to JAM Rule 56.1 Statement as Exhibits 10 & 11. Reznor's signature appears on this application. However, he says that his understanding was that he would be the sole owner of the trademark and that he never intended to give half ownership to Malm. Reznor Dep. at 175–76, 295. Reznor also says he did not read the paragraph that stated that Reznor and JAM would co-own the mark. *Id.* at 299. Toorock's law partner, Ross Rosen, Esq., asserts that, when he asked Malm about the co-ownership, Malm replied that he did not consider himself to own the trademark and that his name was only on the registration so he would have the authority to act against infringers without bothering Reznor. Deposition of Ross Rosen, 9/14/04, at 190.

On March 19, 1998, Minnich and his colleague Mark Svat, Esq., filed another joint application for a trademark on behalf of Reznor and JAM, this time for two logos. 1998 Trademark Application, attached to JAM Rule 56.1 Statement as Exhibit 12. While a signature purporting to be Reznor's appears, Reznor denies that the signature is his, Reznor Dep. at 307, and the signature clearly differs from the one on the 1993 application. When attempting to renew the 1993 trademarks in 2003, Malm asked the lawyers why he could not simply sign the application himself and told them it was difficult getting ahold of Reznor for his signature. Deposition of Mark Svat, Esq., 10/6/04, at 14–16, 24. Informed that he could sign alone if he represented that he had Reznor's authority to sign on Reznor's behalf, Malm did so. *See* Svat Letter, 11/18/03, attached to Shiffman Opp.-Malm Aff. as Exhibit 5. Malm, however, had not discussed this particular matter with Reznor; indeed, he never discussed "any of this stuff" with Reznor, who, after discussing the initial trademark registrations with Malm, told Malm to "just handle it." Malm Dep. at 667–68.

In 1994, the 1989 agreement expired by its own terms. At Malm's request, Toorock prepared two draft agreements substantially identical to the 1989 agreement, although they also contained new language clarifying that JAM would not receive commissions on income Reznor derived from companies owned by Malm. Tr. at 11–12. The only difference between the two drafts was that one contained a sunset clause and the other did not. Malm Dep. at 427; Toorock Letter, 9/30/03, attached to JAM Rule 56.1 Statement as Exhibit 15. According to Malm, once again he did not specify any terms. *Id.* at 427–28. According to Toorock, Malm requested the changed language regarding commissions and said he and Reznor had agreed to all the terms except the sunset clause, which they had discussed but on which they had not decided. *See* Tr. at 9. In any case, neither agreement was ever signed, and the parties continued acting as if there had been no change in their relationship. *See* Malm Dep. at 429; Reznor Dep. at 196–96.

Reznor and NIN released their second album in 1994 and then embarked on their first international tour, which ended in early 1995. Malm Aff. ¶ 20. While the tour earned $1.5 million in profits, according to Malm that amounted to only 20 percent of gross revenues, and so Malm was entitled to all of it under the terms of the management agreement. *Id.;* Malm Dep. at 771. However, Malm was not paid his full commission from the tour in cash. Malm Aff. ¶ 21; Reznor Dep. at 151.

Some of the money Malm claimed to be owed was paid him in the form of half ownership of a new holding company, Hot Snakes, that was formed on April 20, 1995 to own a new studio. Malm Dep. 338, 679–81; Reznor Dep. at 151; Malm Aff. ¶ 18. Malm says he and Reznor agreed that Malm would defer collecting the remaining payments, with Reznor to pay him the balance later. Malm Dep. at 773–78. Malm also says he continued to defer commissions for the next few years, with the total reaching $2.2 million by the end of 1999. *See* Summary of Unpaid Commissions & Expenses ("Commission Summary"), attached to Defs.' Rule 56.1 Counter-Statement as Exhibit 5.[6] Reznor says that, while he understood Malm's position that Reznor owed him considerably more money than Malm had been paid so far, Reznor did not agree that Reznor himself was entitled to nothing after two years of touring, although he admits he never expressed these misgivings to Malm. Reznor Dep. at 154. Reznor also says there was no discussion, let alone agreement, that he would ever "repay" Malm any money. Reznor Dep. at 152.

Reznor and Malm later created three other companies in which each owned 50 percent: Nothing Interactive, Inc. ("NI"), on March 23, 1995; Nothing Records Limited, Inc. ("NRLI"), on January 21, 1997; and Halo Holding, on April 4, 1998. Malm Aff. ¶¶ 17–18. Malm had check-signing authority for each company. Malm Dep. at 307–08. It is unclear whether Reznor also had such authority, but it appears undisputed that he never attempted to exercise such authority. *See, e.g.,* Malm Dep. at 308.

On January 12, 1996, Malm hired Richard Szekelyi to provide financial consulting services to JAM and to the jointly owned companies. Affidavit of Richard Szekelyi, sworn to 6/30/04, ¶ 6; Engagement Letter, 1/12/96, attached to Affirmation of Michael F. Lynch, 11/19/04, ("Lynch Aff.") as Exhibit I. While Reznor says Malm told him to consult Szekelyi if he had any financial issues, Reznor Dep. at 56, Szekelyi says he never provided services to Reznor personally. Szekelyi Dep. at 16. However, his duties included examining Reznor's personal financial records, as well as those of companies wholly owned by Reznor, *see, e.g.,* 1996 Personal Financial Statement of Michael T. Reznor, attached to Lynch Aff. as Exhibit L. Szekelyi quickly discovered that the accounting between the various entities was severely flawed. For example, the depreciation of expensive recording equipment paid for by Reznor was carried on the books of Hot Snakes, which was now jointly owned, resulting in Malm receiving much of the tax benefit that should have gone solely to Reznor.[7] Szekelyi Dep. at 521–24.

Around 1998, Interscope stopped funding NRI. Malm Aff. ¶ 24. To keep the jointly owned companies operating, Malm and Szekelyi began making transfers to them, booked as loans, from both JAM's funds and Reznor's funds.[8] *Id.* 23. Rez-

---

**6.** According to Malm's accounting, about $600,000 of the shortfall was owed him even before the 1994–95 tour, while about $1.4 million came due in 1995 as a result of the tour and another $200,000 came due in 1999.

**7.** The parties have not indicated what actions Szekelyi or Malm took when they discovered this error or when, if ever, Reznor was informed of it. In his Rule 56.1 Statement, Reznor asserts that the mistake "was never rectified," *see* Plaintiff's Response to State-

ment of Undisputed Material Facts Submitted by Szekelyi and Navigent Group ¶ 33, but in the cited deposition passages there is no discussion of what was done about the mistake. *See* Szekelyi Dep. at 521–24.

**8.** While Szekelyi vigorously maintains that his participation in these transfers was very limited, there is evidence in the record from which a fact-finder could infer active participation.

nor maintains that, while he knew money was being loaned to these companies, he was unaware this money was being shifted from his personal accounts. Reznor Dep. at 12–13, 208–09. On February 23, 1999, Rosen informed Malm that he was concerned about the deficits the jointly owned companies were now running and that the use of personal funds might someday be interpreted "as a breach of fiduciary duty." Rosen Letter of Feb. 23, 1999, attached to Shiffman Opp.-Malm Aff. as Exhibit 7.

From November 1999 to July 2000, Reznor and NIN again went on tour. JAM asserted a claim to its commission of 20 percent on the gross income from the American leg of the tour. Malm Aff. ¶ 22. Rosen, who represented a holding company for tour proceeds that was owned by Reznor, *see* Rosen Dep. at 233, told Malm he believed JAM's commission was too high. *Id.* at 234–35. Malm responded that Reznor was "okay with it" and had other lawyers to look out for him. *Id.* at 235–36.

Meanwhile, in the absence of funding from Interscope, the jointly owned companies NRI and NRLI increasingly focused on providing Reznor with personal services. NRI became Reznor's personal bookkeeping operation, while NRLI served as Reznor's publicity company. Malm Aff. ¶ 24. On the other hand, Malm used the companies' office space for his own company and cannot remember how much rent he paid. Malm Dep. at 257. In 2001, JAM stopped loaning money to NRI and NRLI because, according to Malm, JAM had run out of liquid assets. Transfers continued to be made from the assets of Reznor, who still had a significant amount of annual income. Malm Aff. ¶ 23. By July 2002, Reznor had contributed

about $1.47 million more in loans to the joint companies than had JAM, a difference reflected on Reznor's personal financial statement as money that JAM owed him, although this sum was more than offset by the more than $1.5 million that (according to a summary prepared by Szekelyi) Reznor owed JAM in deferred commissions. *See* NIN/Nothing Financial Summary July 2002, attached to JAM Rule 56.1 Statement as Exhibit 20.

That July, Malm, Szekelyi and Reznor met in New York. Szekelyi presented Reznor and Malm with a detailed summary of Reznor's finances, which Reznor and Malm signed and dated in acknowledgment that they had reviewed and understood it. *Id.;* Szekelyi Dep. at 54. This summary of Reznor's finances included a line item indicating, without elaboration, that Reznor owed JAM $1.56 million in commissions. At this time, the idea of shutting down NRI and NRLI was discussed but rejected because doing so would have complicated relations with Interscope, with which the joint companies were in litigation. Reznor Dep. at 89. A similar meeting was held in June 2003. Malm Dep. at 470; Szekelyi Dep. at 61; 2003 Personal Financial Statement, attached to JAM Rule 56.1 Statement as Exhibit 21. By then, Reznor was owed almost $5.5 million by the joint companies, and Szekelyi noted in the summary that no estimate had been made "of the realizable value of these advances." [9] *Id.*

Around that time, Malm contacted Rosen about representing Reznor in connection with a new written management agreement between Malm and Reznor. Rosen Decl. ¶ 8. Rosen advised Malm that JAM would have to retain separate counsel, and JAM did so. *Id.* In November, Rosen received from Malm, for the first

---

*See, e g.,* Deposition of Dean Parker, 10/13/04, at 117–18.

9. Both sides agree that the joint companies are at present effectively shells and that the money loaned to them is extremely unlikely ever to be repaid.

time, a copy of the 1989 Agreement. *Id.* ¶ 9. Not until that Fall did Rosen learn how much of Reznor's money had been loaned to the jointly owned companies. *Id.*

In September 2003, having concluded that Malm had "run [his] finances into the ground," Reznor hired the firm Gelfand, Rennert & Feldman to manage his business affairs. Reznor Dep. at 23–24, 408–11. In December, Rosen telephoned Malm to inform him that Reznor had fired him as his manager. The decision had been made two weeks earlier, based on what Reznor says were "discoveries" made by Gelfand Rennert. *Id.* at 9. Until that Fall, he says, he had been unaware of most of the details of his arrangement, including that Malm's 20 percent commission was paid out of gross revenues. *Id.* at 24–25. According to an analysis performed by Reznor's new managers, by the end of 2003 he had contributed more than $3.6 million in loans to the joint companies, compared with $640,000 contributed by Malm and his companies. Harper Analysis, attached to Affirmation of Steven Shiffman in Opposition to Szekelyi and Navigent, 12/3/04, as Exhibit 9.

On April 21, 2004, Malm and JAM filed a lawsuit against Reznor in Ohio. On May 19, 2004, Reznor filed this suit. The two suits have been consolidated here, *see* Order, 8/20/04, with Malm's complaint refashioned as a counter-complaint.

Against this background, the Court turns to the summary judgment motions.

■ *First,* with regard to Reznor's claims against Malm and JAM (hereinafter, collectively "Malm"), for damages and rescission of the 1989 Agreement, based on breach of fiduciary duty, both sides seek summary judgment in their respective favor. These claims, the parties agree, are governed by New York law, pursuant to a choice of law provision in the 1989 Agreement.[10] Under New York law, a fiduciary relationship exists when one person "is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Mandelblatt v. Devon Stores, Inc.,* 132 A.D.2d 162, 168, 521 N.Y.S.2d 672 (N.Y.App.Div.1987), *quoting* Restatement (Second) of Torts § 874, cmt. a (1977).

■ Malm argues that his managerial relationship with Reznor was a "conventional business relationship" rather than a fiduciary one, *see Reuben H. Donnelley Corp. v. Mark I Mktg. Corp.,* 893 F.Supp. 285, 289 (S.D.N.Y.1995), and that he is therefore entitled to summary judgment dismissing these claims. But a reasonable jury, construing the record most favorably to Reznor, could find that Malm's special position as trusted advisor to Reznor created a fiduciary duty to Reznor for any or all of the events in question, beginning even before the 1989 signing of the management agreement. *See Gershunoff v. Panov,* 77 A.D.2d 511, 512–13, 430 N.Y.S.2d 299 (N.Y.App.Div.1980) (finding fiduciary relationship created by manager-performer relationship). If such a relationship were created, Malm would be "bound by a standard of fairness, good faith and loyalty." *Croce v. Kurnit,* 565 F.Supp. 884, 892 (S.D.N.Y.1982). A jury could find that Malm breached this duty by engaging in self-dealing, resulting in Reznor losing considerable amounts of money. *Cf. Gershunoff,* 77 A.D.2d at 512–13, 430 N.Y.S.2d 299.[11]

---

**10.** The provision states that the "validity, interpretation and legal effect" of the contract shall be governed by New York law. 1989 Agreement ¶ 16(d).

**11.** Malm argues that he (Malm) also lost money through the loans to the joint companies, but this simply means Reznor may not be able to collect disgorgement of profits, *see* Restatement § 874, cmt. b, not that damages are unavailable.

██ Malm also argues that these claims are time-barred in whole or in part. Under New York law, a claim for damages based on breach of fiduciary duty has a three-year statute of limitations, *see* N.Y. C.P.L.R. § 214(4), while a parallel rescission claim, sounding in equity, has a six-year limitations period. *See id.* § 213(1). However, neither period begins until the plaintiff is on actual or inquiry notice of the relevant facts, *see, e.g., Sferra v. Mathew,* 103 F.Supp.2d 617, 620–21 (E.D.N.Y. 2000), and there is sufficient evidence for a jury to conclude that Reznor himself was reasonably unaware of the relevant facts as late as 2003. Although Malm argues that Reznor's advisors, especially Rosen, had earlier knowledge that should be imputed to Reznor, numerous disputed questions remain as to the nature and scope of their agency that must be resolved before one can determine the effect of such imputed knowledge, if any. Likewise, whether Reznor had actual or imputed knowledge sufficient to estop him from asserting these claims is a genuinely disputed question for trial.

██ Similarly, the many material factual disputes that surround these claims of breach of fiduciary duty preclude summary judgment in Reznor's favor, just as they preclude it in Malm's favor. Reznor's relationship with Malm was still relatively informal at the time of the 1989 Agreement, and Malm had little more experience than Reznor in such dealings. A jury could find that Malm did not yet owe a fiduciary duty to Reznor, *see Tyson v. Cayton,* 784 F.Supp. 69, 76 (S.D.N.Y.1992) (finding it question of fact for trial whether fiduciary duty existed prior to signing of first managerial agreement), or that under the circumstances Malm, who is not a lawyer and did not understand or request the inclusion in the agreement of many of the terms now at issue, fulfilled whatever duty he owed Reznor by disclosing all the material terms and facts of which he was aware. It is true that, by the time Malm began authorizing loans to the jointly owned companies and taking other actions on Reznor's behalf, his fiduciary obligations were clearer. However, there remains considerable dispute as to the extent to which Reznor was aware of and implicitly or explicitly consented to these actions. Moreover, Malm asserts that Reznor derived various personal benefits from these expenditures of his funds, and so it remains disputed whether Malm's activities were improper and the extent to which Reznor was harmed by them.

Accordingly, both sides' motions for summary judgment are denied as to Reznor's claims against Malm and JAM of breach of fiduciary duty.

██ *Second,* Malm seeks summary judgment as to Reznor's claims against Malm (and JAM) alleging fraud after the signing of the 1989 Agreement. Under New York law (which also governs these claims), a fraud claim requires proof, by clear and convincing evidence, of "(1) a material misrepresentation or omission of facts, (2) made with knowledge of its falsity, (3) with an intent to defraud, and (4) reasonable reliance on the part of the plaintiff, (5) that causes damage to the plaintiff." *Schlaifer Nance & Co. v. Estate of Warhol,* 194 F.3d 323, 336 (2d Cir.1999) (citation omitted). Here, a jury, taking the evidence most favorably to Reznor, could readily find that Malm intentionally misled Reznor about various transactions, knowing full well that Reznor would reasonably rely on his representations. To give just one example, a jury could find that Malm fraudulently led Reznor to believe that Reznor would have full ownership of the NIN trademarks and of the merchandising company. While Malm also argues that these claims are barred by the statute of limitations—which bars fraud claims not brought within six years from the commission of the fraud or two years

from the time the plaintiff discovered the fraud or, with reasonable diligence, should have done so, *Shannon v. Gordon,* 249 A.D.2d 291, 292, 670 N.Y.S.2d 887 (N.Y.App.Div.1998)—as already stated, when Reznor knew or should have known of the alleged fraud is a genuinely disputed question of fact that the jury must resolve. Accordingly, summary judgment is denied as to Reznor's fraud claims against Malm and JAM.

■ *Third,* Malm seeks summary judgment on Reznor's claim that the 1989 agreement, its 1994 continuation, and various other agreements were fraudulently induced and should be rescinded. Although rescission is "an extraordinary remedy," it is available where plaintiff can prove fraud in the inducement. *Mina Investment Holdings Ltd. v. Lefkowitz,* 16 F.Supp.2d 355, 362 (S.D.N.Y.1998). A jury could find that Malm made material misstatements of fact in the making of these agreements, including representing to Reznor that Toorock was protecting his legal interests.[12] Accordingly, the fraudulent inducement claim also survives summary judgment.

■ *Fourth,* Malm seeks summary judgment on Reznor's claim that various agreements, most notably the 1989 Agreement, were unconscionable and should be rescinded. In New York, unconscionability is a matter of law for a court to decide,

not a jury question. *See Estate of Louis T. Arena v. Abbot & Cobb, Inc.,* 158 A.D.2d 926, 926, 551 N.Y.S.2d 715 (N.Y.App.Div. 1990). While, under some circumstances, it is appropriate. for· a court to hold an evidentiary hearing on the issue, the court is not required to do so where no reasonable doubt as to the validity of a contractual provision has been raised by the claimant's submissions. *See, e.g., Am. Tel. & Tel. Co. v. N.Y.C. Human Resources Admin.,* 833 F.Supp. 962, 989 (S.D.N.Y.1993).

■ At a minimum, an unconscionability claim requires proof that a contract "was both procedurally and substantively unconscionable when made—*i.e.,* some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Gillman v. Chase Manhattan Bank,* 73 N.Y.2d 1, 10, 537 N.Y.S.2d 787, 534 N.E.2d 824 (1988) (internal quotations and citations omitted). In assessing procedural unconscionability, "the focus is on such matters as the size and commercial setting of the transaction ..., whether deceptive or high-pressured tactics were employed, the use of fine print in the contract, the experience and education of the party claiming unconscionability, and whether there was disparity in bargaining power." *Id.* at 11, 537 N.Y.S.2d 787, 534 N.E.2d 824. As suggested by the inclusion of

---

**12.** Although Malm argues that Ohio law applies to this claim, which sounds in tort and therefore is not necessarily governed by the law chosen by the contract, *see Krock v. Lipsay,* 97 F.3d 640, 646 (2d Cir.1996), he has not provided the sort of briefing that would help the Court resolve this choice-of-law question. The starting point must be whether, under the choice-of-law doctrine of the state (Ohio) whose law otherwise would apply, the contractual provision at issue governs a claim of fraud arising out of the contract's formation. *See id.* (applying New York choice-of-law law and determining that contract, which was made in New York but chose Massachu-

setts law, did not preclude application of New York law to fraud claim); *Turtur v. Rothschild Registry Int'l, Inc.,* 26 F.3d 304, 309–10 (2d Cir.1994) (determining that Texas law permits contract made in Texas to bind parties to application of New York law in tort claims arising out of contract). Because neither side has cited any relevant cases, and because application of Ohio law would not in any event affect the outcome of this motion, the Court for now does not reach the question of which law applies but urges the parties to provide the Court with relevant briefing in the schedule ·set for motions *in limine* prior to trial.

factors such as "the size and commercial setting of the transaction," the archetypal application of this doctrine is to a "contract of adhesion" between a business and a consumer or between a business and an employee, *see Am. Tel. & Tel. Co. v. N.Y.C. Human Resources Admin.*, 833 F.Supp. 962, 989 (S.D.N.Y.1993) (rejecting unconscionability claim where "the contract at issue ... is not the type of contract entered into by an unwary consumer"); *see also* Todd D. Rakoff, Contracts of Adhesion: An Essay in Reconstruction, 96 Harv. L.Rev. 1173, 1283–84 (1983) (justifying greater judicial scrutiny in cases involving a company and an individual consumer). Indeed, courts "have rarely found a clause to be unconscionable" in contracts involving two commercial entities, a situation in which negotiation is presumed possible. *See Am. Dredging Co. v. Plaza Petroleum*, 799 F.Supp. 1335, 1339 (E.D.N.Y.1992).

 There is no allegation here that Reznor lacked bargaining power relative to Malm or that Malm pressured him into signing any deal. *See Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 68, 412 N.Y.S.2d 827, 385 N.E.2d 566 (1978) (unconscionability doctrine is meant to deal with situations where there is "a significant disparity in bargaining power"). Instead, Reznor argues that Malm, taking advantage of the trust Reznor placed in him, fraudulently induced him into entering the contract without scrutinizing its contents by making material misrepresentations as to its terms, failed to make full disclosures as to the import of various contractual provisions despite an obligation to do so, and misled him into believing that Malm and Toorock were protecting his interests when they were not. These are arguments for claims of fraud and breach of fiduciary duty, not for a claim of uncon-

scionability. For one party, by exercise of power or pressure, to extract the other party's consent to a one-sided contract may render the contract unconscionable; but for one party to dupe another party into entering into a one-sided contract is fraud.

 In addition, Reznor has provided no evidence of substantive unconscionability. He simply asserts in conclusory fashion that the management agreement is "unfair on its face" and that every term favors Malm. However, the test for substantive unconscionability is not simply that a deal favors one party over the other, but that it is so "unreasonably favorable," *Gillman*, 73 N.Y.2d at 12, 537 N.Y.S.2d 787, 534 N.E.2d 824, as to constitute a "transgression of a strong public policy" that overcomes the ordinary presumption that "the parties to a contract are basically free to make whatever agreement they wish, no matter how unwise it might appear to a third party." *Rowe*, 46 N.Y.2d at 68, 412 N.Y.S.2d 827, 385 N.E.2d 566. While it is possible that Reznor could have commanded more favorable terms had he driven a tougher bargain, there is no admissible evidence that the objected-to provisions in the management agreement were unusual for the industry, let alone that they violated any public policy. Indeed, all indications are that Toorock provided a contract in which most provisions were standard. On the basis of this record, no reasonable court could find these provisions unconscionable as a matter of law.

It is Reznor's burden to "overcome the presumption of conscionability," *Estate of Louis T. Arena v. Abbot & Cobb, Inc.*, 158 A.D.2d 926, 926, 551 N.Y.S.2d 715 (N.Y.App.Div.1990), and he has not done so. Accordingly, Reznor's unconscionability claim is dismissed.[13]

---

**13.** The Court does not reach Malm's alterna-

tive argument that the unconscionability

*Fifth,* Malm moves for summary judgment on Reznor's breach of contract claims against Malm (and JAM), to the extent they allege breaches before May 19, 1998. The Court agrees that any such claims are time-barred. Under New York law, breach of contract claims must be brought within six years of the alleged breach, regardless of whether plaintiff was aware at the time of the breach that he had a cause of action. *Ely–Cruikshank Co. v. Bank of Montreal,* 81 N.Y.2d 399, 403, 599 N.Y.S.2d 501, 615 N.E.2d 985 (1993). Here, Reznor claims that Malm breached contractual requirements to "confer with, counsel and advise" him on all matters pertaining to his career, including compensation other artists were earning; but he fails to allege when these breaches occurred. Summary judgment is therefore granted dismissing any claim for any such breaches that occurred before May 19, 1998.

*Sixth,* Reznor seeks summary judgment on Malm's counterclaims, under breach of contract and conversion theories, for unpaid commissions and expenses from the 1994–95 tour and earlier. Here, again, the problem is one of statute of limitations. The 1989 Agreement (either alone or as extended) entitled Malm to payments immediately upon Reznor's receipt of Reznor's own compensation. By Malm's own sworn account, he told Reznor almost immediately after the 1995 tour that Reznor owed him money but that he would take no action to collect it. A statute of limitations period would be meaningless if a party's intentional forbearance from demanding payment could nullify it. While Reznor was perhaps not in breach until a reasonable period of time to make his payments had passed, no juror could find that Reznor was in breach later than April 21, 1998, six years before Malm filed his suit in Ohio.

As for the alleged oral agreement between Reznor and Malm to defer payments, a signed writing is necessary to stop the limitations clock on a breach of contract claim, *see* N.Y. Gen. Oblig. L. § 17–101. In attempt to satisfy the signed writing requirement, Malm points to the 2002 financial summary, which Reznor signed to indicate he had read and understood it. But nowhere does Reznor indicate agreement that he owed the sums indicated, much less an intention to revive any stale claims to that money. *See Nat'l Westminster Bank USA v. Petito,* 202 A.D.2d 193, 608 N.Y.S.2d 427, 428 (N.Y.App.Div.1994) (requirement is signed document containing "plain admission that the debt is due and the party is willing to pay it").

Malm also argues that Reznor made partial payments on his debt in 1999. It is true, of course, that a statute of limitations period can be renewed by partial payment of principal or interest that implies "a promise to pay the remainder of the debt," *see Skaneateles Savs. Bank v. Modi Assocs.,* 239 A.D.2d 40, 43, 668 N.Y.S.2d 819 (N.Y.App.Div.1998); but here there is insufficient evidence in the record to support any such assertion. Malm points to a summary of paid and unpaid commissions prepared by Szekelyi that shows that in 1999, when Reznor received a $1.67 million recording advance (the first time he had made more than $250,000 since the 1994–95 tour) and thereby owed Malm $334,000, he made a $100,000 payment. *See* Commission Summary. But there is no indication that this payment was made against deferred prior debt; the only reasonable inference, without any other evidence in the record, is that it was Malm's commission for Reznor's substantial income that year. Moreover, even had the payment been clearly accounted for as

claim is time-barred.

a partial payment on past-due commissions, it would not be evidence of Reznor's intent to honor the remaining debt, since there is no indication that Reznor authorized or even was aware of this payment.

Accordingly, summary judgment is granted to Reznor as to Malm's breach of contract and conversion claims claiming unpaid commissions from 1995 and earlier.[14]

 *Seventh,* Malm seeks summary judgment on Reznor's negligence claim against Malm to the extent that it alleges damages that accrued before May 19, 2001. In his negligence claim, Reznor alleges that Malm failed to exercise the degree of skill reasonably expected of a business manager in supervising NIN's tours and ensuring their profitability. In particular, he alleges that Malm failed to properly advise Reznor that how profitable the tours were would have no impact on Malm's commissions, which were based on the gross proceeds. However, the statute of limitations for negligence is three years,

N.Y. C.P.L.R. § 214(4), meaning that Reznor is barred from bringing a cause of action that accrued more than three years before he brought this suit, on May 19, 2004.[15] This cause of action accrues when the acts or omissions constituting the negligence produce the injury. *Triangle Underwriters, Inc. v. Honeywell Information Systems, Inc.,* 604 F.2d 737, 744 (2d Cir. 1979). Reznor's most recent tour ended in the summer of 2000. Accordingly, any cause of action under this theory related to the tours is time-barred.[16]

 *Eighth,* Malm seeks summary judgment on Reznor's claim for conversion. Conversion is "the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." *Wechsler v. Hunt Health Sys.,* 330 F.Supp.2d 383, 431 (S.D.N.Y.2004) (citation omitted). Plaintiff must show that (1) plaintiff had a legal ownership interest in the property, and (2) defendant "exercised unauthorized interference with the plain-

14. Malm's summary of commissions owed and paid suggests he should have been paid $334,000 in 1999 but only was paid $100,000. Although it is unclear whether he is asserting a claim to this difference, if he is it is within the six-year limitations period and survives summary judgment.

15. Reznor cites the doctrine of continuous representation, which tolls the statute of limitations where defendant continuously rendered professional services to the plaintiff in connection with the transactions that are the subject of the plaintiff's complaint. However, this doctrine only applies to malpractice claims against professionals, such as doctors, attorneys or accountants, *see Castle Oil Corp. v. Thompson Pension Employee Plans,* 299 A.D.2d 513, 514, 750 N.Y.S.2d 629 (App.Div. 2002), who in return are subject to a special three-year limitations period for all claims. N.Y. C.P.L.R. § 214(6). Treatment as a "professional" for these purposes requires qualities such as "extensive formal learning and training, licensure and regulation indicating a qualification to practice, a code of conduct imposing standards beyond those accepted in

the marketplace and a system of discipline for violation of those standards." *Chase Scientific Research v. NIA Group,* 96 N.Y.2d 20, 29, 725 N.Y.S.2d 592, 749 N.E.2d 161 (2001). Courts consistently have rejected extension of the continuous representation doctrine to occupations that do not fit easily into this narrow definition of a professional. *See, e.g., Castle Oil,* 299 A.D.2d at 514–15, 750 N.Y.S.2d 629 (actuaries not professionals); *Matthews and Fields Lumber Co., Inc. v. New England Ins. Co.,* 113 F.Supp.2d 574, 578–79 (W.D.N.Y.2000) (insurance companies and brokers not professionals). Malm is not a professional for these purposes, and so the continuous representation doctrine does not apply.

16. Reznor asserts, without elaboration, that Malm is also negligent based on more recent events. To the limited extent that Reznor can show that Malm's negligence produced injury after May 19, 2001, this claim survives summary judgment.

tiff's ownership or possession of that property." *Id.* On the instant record, a jury could reasonably find that Malm converted assets belonging to Reznor by transferring Reznor's money to the jointly held companies without authorization. Malm argues that no money was transferred to him, and so he received no benefit from the transfers. However, the tort of conversion does not require that the defendant benefit from his interference with the plaintiff's ownership interest. Summary judgment is therefore denied as to this count.

*Ninth,* co-defendants Szekelyi and Navigent Group (hereinafter, collectively "Szekelyi") seek summary judgment on Reznor's claims against them of negligence, breach of fiduciary duty, and malpractice. There is little distinction between these claims, all of which allege that Szekelyi did not meet the standards of the accounting profession in the performance of professional duties to Reznor. *See Sec. Investor Prot. Corp. v. BDO Seidman, LLP,* 49 F.Supp.2d 644, 654 (S.D.N.Y. 1999).

▄▄▄ Since Reznor was not Szekelyi's client,[17] Szekelyi would be liable to Reznor for malpractice only where he was aware that the nonclient would rely on his work for a particular purpose, *see Credit Alliance Corp. v. Arthur Andersen & Co.,* 65 N.Y.2d 536, 551, 493 N.Y.S.2d 435, 483 N.E.2d 110 (1985); *Ambassador Factors v. Kandel & Co.,* 215 A.D.2d 305, 306–07, 626 N.Y.S.2d 803 (N.Y.App.Div.1995). Szekelyi's presentations to Reznor in 2002 and 2003 meet this standard, and so Szekelyi is liable for any malpractice he may have committed in preparing and presenting these reports of Reznor's financial status. However, there is no evidence that Szekelyi breached any standard of care in preparing and presenting these reports. Reznor does not allege any inaccuracies in these reports;[18] rather, after establishing that Szekelyi owed a duty of care with respect to these reports, he argues that Szekelyi failed to counsel Reznor adequately concerning certain other transactions. Because Szekelyi was not Reznor's accountant or business manager, he owed Reznor in his individual capacity no such duty with respect to other transactions.[19]

▄▄▄ *Tenth,* Szekelyi (and Navigent) also move for summary judgment with respect to Reznor's claims against them alleging fraud and aiding and abetting fraud. An accountant can be liable to a nonclient for fraud if he has knowledge of the falsity

**17.** Reznor argues that he and the attorney Ross Rosen understood Szekelyi to be his business manager, and that this creates an issue of triable fact. However, to the extent that someone other than Szekelyi (most notably Malm) led them to believe this, this "evidence" is inadmissible hearsay against Szekelyi, and there is no indication that they had any other grounds on which to form this belief. Reznor also argues that the fact that Szekelyi's duties included reviewing Reznor's finances and the records of Reznor's wholly-owned companies made Szekelyi his accountant. But there is no evidence in the record before this Court that Szekelyi performed any of these services on Reznor's behalf or at Reznor's direction.

**18.** Reznor does argue that there were inaccuracies in a report Szekelyi performed regarding Reznor's finances in 1996, specifically that this report did not state that Reznor was loaning more money to the jointly held companies than was Malm and that the report listed those loans as "fully collectible." However, there is no evidence that, as of that time, Reznor *was* loaning more money than Malm. Nor is there evidence that Szekelyi's statement that the loans were fully collectible constituted wrongdoing at that time, when the companies still were being funded by Interscope.

**19.** Reznor claims that Szekelyi had a conflict of interest when simultaneously working for JAM and the jointly held companies. However, he does not attempt to recover on behalf of the jointly held companies, to which Szekelyi arguably did owe a duty of care. These allegations are therefore irrelevant.

of his client's statements or acts in reckless disregard of such falsity where the circumstances should cast doubt on the information's veracity and where the accountant is aware of the plaintiff's reasonable reliance on him. *See Houbigant,* 303 A.D.2d at 99–100, 753 N.Y.S.2d 493. Here, Reznor alleges that Szekelyi assisted Malm in secretly and illegally diverting Reznor's money into the jointly held companies. However, there is no evidence that, even if Malm were defrauding Reznor by misleading him as to which accounts the loans were coming from, Szekelyi knew or should have known of any impropriety.[20] Indeed, there is no evidence that Szekelyi did anything but attempt to correct the only clearly flawed accounting in evidence, *i.e.,* the improper tax treatment of the Hot Snakes recording equipment. Accordingly, summary judgment must be granted on the fraud claims, which also means that, given the above-described grant of summary judgment on the other claims against Szekelyi and Navigent,[21] summary judgment is granted as to *all* counts against Szekelyi and Navigent Group.

In sum: Malm's motion for summary judgment is granted with respect to (a) Reznor's unconscionability claims, (b) Reznor's breach of contract claims to the extent that they allege breaches before May 19, 1998, and (c) Reznor's negligence claims that accrued before May 19, 2001; and is otherwise denied. Reznor's motion for summary judgment is granted with

respect to Malm's counterclaims for breach of contract and conversion arising out of commissions allegedly owed prior to April 21, 1998; and is otherwise denied. The motion of co-defendants Szekelyi and Navigent Group for summary judgment is granted in full, and they are dismissed from the case, with prejudice. The remaining claims will proceed to trial, as scheduled, beginning at 9 a.m. on May 16, 2005.

SO ORDERED.

---

**20.** Reznor implies that various financial arrangements, including the joint ownership of the merchandising company and the transfer of money from Reznor's personal accounts to the joint companies, were so facially suspect that Szekelyi should have been on notice that Reznor did not consent to them. But Reznor has submitted no evidence to back up this proposition, such as an affidavit from another accountant. *Cf. Ris v. Finkle,* 148 Misc.2d 773, 777–78, 561 N.Y.S.2d 499 (N.Y.Sup.Ct. 1989) (granting summary judgment where plaintiff failed to produce expert testimony as

to what accountant's standard of care was). Indeed, the record does not even contain the various records that Szekelyi would have seen or an accounting of the transactions that took place. On this record, a jury could do no more than speculate wildly about what any accountant should have known or should have done.

**21.** The Court does not reach the argument that all claims against Szekelyi and Navigent Group are also barred by various statutes of limitations.