[753 NYS2d 493]

Houbigant, Inc., et al., Respondents-Appellants, v Deloitte &
Touche, LLP, Appellant-Respondent, et al., Defendants.

First Department, January 21, 2003

## APPEARANCES OF COUNSEL

*John W. Schryber* of counsel, Washington, D.C. (*Mary E. Flynn*, New York City, and *Kieran X. Bastible* on the brief; *Patton Boggs, LLP*, and *Morrison Cohen Singer & Weinstein, LLP*, attorneys), for respondents-appellants.

*Michael P. Carroll* of counsel (*Jerome G. Snider, Michael S. Flynn, William C. Komaroff, Matthew S. Stewart* and *Susan L. Shin* on the brief; *Davis Polk & Wardwell*, attorneys), for appellant-respondent.

## OPINION OF THE COURT

Saxe, J.

This appeal focuses on claims of accounting malpractice and fraud against Deloitte and Touche LLP (Deloitte). Plaintiffs Houbigant, Inc. and Etablissement Houbigant (collectively, Houbigant) own the trademarks for various perfumes, the marketing and sales of which they licensed to various subsidiaries of Renaissance Cosmetics, Inc. (RCI) beginning in 1994. RCI and another of its subsidiaries, Cosmar Corp., executed guaranties in connection with those licenses, in which they warranted that they had and would maintain a net worth of at

least $10 million, and in which they gave Houbigant the right to terminate the licenses in the event a guarantor became insolvent or failed to comply with its net worth warranty. These two guarantors also agreed to furnish the same financial statements to Houbigant that they were required to provide their lenders. Houbigant asserts that the net worth requirement was included in order to protect it against failure by the licensees to meet their multiyear, multimillion dollar royalty payment obligations.

Then, despite several years' worth of audited financial statements certifying the financial well-being and substantial net worth of RCI and its subsidiaries, in June 1998 it was disclosed publicly that RCI's net worth had been overstated by nearly $200 million. Because Houbigant had been induced three months earlier, in March 1998, to enter into a modification agreement with RCI in which it waived for one year its right to terminate its licensing agreements, it had to wait until March 1999 to terminate its licenses. It claims that in the intervening nine-month period, its brand equity was severely damaged by the insolvent RCI.

█ We hold that Houbigant's negligence claim against Deloitte as the auditor of RCI's financial statements must be dismissed, since the allegations do not support a claim of privity or a relationship "approach[ing] that of privity" between Deloitte and Houbigant, a nonclient (*see Ultramares Corp. v Touche*, 255 NY 170, 183; *Credit Alliance Corp. v Arthur Andersen & Co.*, 65 NY2d 536, 550; *Parrott v Coopers & Lybrand*, 95 NY2d 479, 483; *Security Pac. Bus. Credit v Peat Marwick Main & Co.*, 79 NY2d 695, 702). Before the law will allow a claim of negligence against an accountant by a nonclient third party, there must be some allegation of "linking conduct" by the accountant, that is, "any word or action on the part of [the accountant] directed to plaintiffs," so as to "link" the accountant to the nonclient (*see Credit Alliance Corp. v Arthur Andersen & Co.*, 65 NY2d 536, 553-554).

The requisite linking was not established by Houbigant's entitlement under the terms of the license to receive a copy of RCI's audited financial statement, by Deloitte's consent to RCI forwarding a copy of the financial statements to Houbigant, or by Deloitte's knowledge that Houbigant would rely upon the information contained in the financial statements (*see Credit Alliance* at 553-554). Deloitte's task, in the course of the audit, of assessing whether RCI was complying with its contractual obligation to Houbigant to maintain a $10 million net worth,

was a task performed pursuant to professional standards applicable in the context of any audit, and was not undertaken pursuant to any duty owed toward Houbigant. Therefore, it cannot constitute the type of "linking conduct" required by *Ultramares, Credit Alliance* and subsequent cases.

■ However, the fraud cause of action should not have been dismissed. As Chief Judge Cardozo pointed out in *Ultramares* (255 NY at 189), even where the law does not permit a claim of negligence to be brought against a professional by a person not in privity with the professional, this rule "does not emancipate accountants from the consequences of fraud."

Houbigant's claim of fraud concerns Deloitte's certification of the accuracy of RCI's audited financial statements for the years ending March 31, 1995, March 31, 1996 and March 31, 1997. Deloitte's certification each year specifically stated that RCI's consolidated financial statements "present[ed] fairly, in all material respects, the financial position of Renaissance Cosmetics, Inc. and subsidiaries." Plaintiffs have provided allegations containing sufficient specificity to make out a claim that these assurances by Deloitte regarding RCI's financial statements for those three years were knowingly false.

Houbigant alleges that RCI's net worth was materially misrepresented each year, in view of the absence of competent support for the values set forth in the financial statements for four asset accounts—inventory, accounts receivable, intangible assets and fixed assets. It relies in part upon a private letter by Deloitte to the RCI audit committee dated June 27, 1997, in which Deloitte recognized and identified various "[r]eportable conditions" and "significant deficiencies in the design or operation of the internal control structure * * * [bearing on the] ability to * * * report financial data consistent with the assertions * * * in the financial statements." The letter, plaintiffs assert, explained some of the causes of those deficiencies. Indeed, Houbigant asserts, these deficiencies and problems were so significant that they appear to have formed the basis for RCI's ultimate insolvency. Yet, none of these deficiencies and problems were mentioned in Deloitte's audit report; further, it is alleged, Deloitte took no action to verify the information called into question by these deficiencies in its subsidiaries' internal control structure.

For one thing, it is alleged that there were deficiencies regarding net accounts receivable. It was finally publicly acknowledged in June 1998 that RCI's sales for the period from March 31, 1996 through March 31, 1997 were overstated

by $18.8 million, due to an understatement of returns, and, thus, an overstatement of sales and accounts receivable. This comports with Houbigant's allegation that RCI's financial statements improperly recorded as sales transactions that were "right of return" consignment sales, which, in the absence of historical experience regarding returns of similar products (as was the case for at least for some of RCI's subsidiaries), should not have been reported as sales. Since the June 27, 1997 letter indicated Deloitte's knowledge that RCI had no methodology in place for measuring historical experience regarding returns, there is reason to conclude both that the financial statements were materially inaccurate and that Deloitte knew this.

Further, repeated corporate acquisitions made by RCI in 1995 and 1996 brought RCI's reported intangible assets to $82 million in 1995, and to $184 million by 1997. It is alleged that Deloitte had an interest in overstating the values of these acquisitions, because it had performed the due diligence for those acquisitions, and had financed some of them. Houbigant claims that despite the representation in RCI's financial statements that it regularly assessed the "recoverability" of such intangible assets, which would correct any initial overstatement, in fact these assets were not subjected to any independent appraisal until January 1997, when they were found to be overstated by $57 million. Houbigant further asserts that because of yearly cash flow losses, the $57 million overstatement should have been the basis for a write-down of fair value for the year ending March 31, 1997, but that, instead, Deloitte chose to ignore the appraisal. These allegations further support the fraud claim. Any contention that Deloitte was in fact unaware of the appraisal must be addressed at trial.

As to the allegation of substantial overstatements in the reporting of net inventory, although Houbigant cannot yet quantify its exact amount, the allegation is supported by the claim that RCI had no system for determining the age of its inventory, and therefore ignored the requirement that it verify the age of inventory so as to determine whether it should be valued at market or cost. Deloitte's argument that this deficiency was not significant is one which may be tested at trial, but it does not suffice to dismiss the claim here.

Other aspects of the June 27, 1997 letter provide further support for the claim that serious accounting deficiencies known to Deloitte led to the material overstatements regarding RCI's net worth, which Deloitte certified as accurate. For instance, the letter reported that one of the RCI subsidiaries

acting as licensee, Houbigant (1995) Limitee, whose insolvency would contractually entitle Houbigant to terminate the license, had failed to maintain *any* separate financial books and records, actually preventing Deloitte from being able to properly certify the accuracy of its financial statements.

In sum, Houbigant alleges that when Deloitte certified the accuracy of RCI's financial statements, it knew, but failed to acknowledge, that RCI's financial statements actually contained numerous serious irregularities and inaccuracies, which it knew could have a material impact on the accuracy of the financial statements' recitation of the corporation's net worth. This is sufficient to adequately plead misrepresentation and scienter.

There is, indeed, a body of case law dismissing fraud claims against accountants pursuant to CPLR 3016 due to insufficiencies in the allegations, especially regarding the element of scienter. However, careful review of these cases impels us to emphasize that at the pleading stage of a fraud claim against an accountant, the plaintiff need not be able to make an evidentiary showing of exactly what the accountant knew as to falsehoods in the certified financial statements.

Initially, in *Credit Alliance Corp. v Arthur Andersen & Co.* (65 NY2d 536), the Court dismissed, as insufficiently pleaded, a fraud claim against an accountant who had certified allegedly misleading financial statements. It explained that

> "[t]he cause of action for fraud repeats the allegations for the negligence cause of action and merely adds a claim that Andersen recklessly disregarded facts which would have apprised it that its reports were misleading or that Andersen had actual knowledge that such was the case. This single allegation of scienter, without additional detail concerning the facts constituting the alleged fraud, is insufficient under the special pleading standards required under CPLR 3016 (b)" (65 NY2d at 554).

Fairly read, this holding requires a fraud pleading to contain a particularized factual assertion which supports the inference of scienter.

The language of CPLR 3016 (b) merely requires that a claim of fraud be pleaded in sufficient detail to give adequate notice (*see Foley v D'Agostino*, 21 AD2d 60, 64). Indeed, the Court of Appeals has specifically noted that this rule "is not to be interpreted so strictly as to prevent an otherwise valid cause of

action in situations where it may be 'impossible to state in detail the circumstances constituting a fraud' " (*Lanzi v Brooks*, 43 NY2d 778, 780, quoting *Jered Contr. Corp. v New York City Tr. Auth.*, 22 NY2d 187, 194). As the *Jered* Court recognized with respect to fraud, sometimes the surrounding circumstances "are peculiarly within the knowledge of the party against whom the [claim] is being asserted" (22 NY2d at 194). The element of scienter, that is, the requirement that the defendant knew of the falsity of the representation being made to the plaintiff, is, of course, the element most likely to be within the sole knowledge of the defendant and least amenable to direct proof.

While some subsequent cases applying the *Credit Alliance* ruling seem to indicate that a fraud pleading against an accountant must contain hard evidence, requiring that it "identify the particular manner in which an item included in the financial statement relied upon has been intentionally or recklessly misrepresented" (*see Lampert v Mahoney, Cohen & Co.*, 218 AD2d 580, 582) or that it *show* "the accountant's knowingly false statement, and knowing and direct participation in the fraud" (*LaSalle Natl. Bank v Ernst & Young*, 285 AD2d 101, 110), we emphasize that CPLR 3016 (b) and the rule set forth in *Credit Alliance* should not be read to require, in the context of a CPLR 3211 dismissal motion, something more than a particularized factual assertion which supports the inference of scienter. The use in cases such as *LaSalle* of the word "shown" in holding that a plaintiff failed to show the accountant's "knowing and direct participation in the fraud" (285 AD2d at 110), should not result in stricter-than-necessary pleading requirements on a fraud cause of action. To require a "showing" of an evidentiary nature (as in *LaSalle*) on a CPLR 3211 dismissal motion improperly imports a summary judgment standard into the orbit of CPLR 3211 analysis, and is beyond what is required to uphold the sufficiency of a pleading.

Keeping in mind the difficulty of establishing in a pleading exactly what the accounting firm knew when certifying its client's financial statements, it should be sufficient that the complaint contains some rational basis for inferring that the alleged misrepresentation was knowingly made. Indeed, to require anything beyond that would be particularly undesirable at this time, when it has been widely acknowledged that our society is experiencing a proliferation of frauds perpetrated by officers of large corporations, for their own personal gain, unchecked by the "impartial" auditors they hired (*see generally*

Gibbs, *Summer of Mistrust*, Time, July 22, 2002, at 16; Coffee, *Guarding the Gatekeepers*, New York Times, May 13, 2002, at A17, col 2; Hilzenrath, *Auditors Face Scant Discipline*, Washington Post, Dec. 6, 2001, at A1; Norris, *Asleep at the Books: A Fraud That went On and On and On*, New York Times, June 16, 2000, at C1, col 2).

Furthermore, there are comparable past cases in which claims of fraud against accountants have been permitted to proceed. In one case, the defendant accountant was alleged to have "recklessly failed to independently verify and investigate the documents of a corporation *it knew had severe internal control and reporting problems*" (*Simon v Ernst & Young*, 223 AD2d 506, 506-507 [emphasis added], citing *Joel v Weber*, 166 AD2d 130). In another, it was alleged that the accounting firm failed to independently verify information provided by the client concerning inventory, purchases of fixed assets, and credits against future accounts receivable, despite "*notice of particular circumstances raising doubts as to the veracity of such information*" (*see Foothill Capital Corp. v Grant Thornton, L.L.P.*, 276 AD2d 437, 437 [emphasis added]; *see also Fidelity & Deposit Co. of Md. v Arthur Andersen & Co.* 131 AD2d 308).

Indeed, in *Ambassador Factors v Kandel & Co.* (215 AD2d 305), this Court denied summary judgment on a *malpractice* claim against accountants on the ground that the allegations supported not a malpractice claim, but a fraud claim. The complaint alleged that the accountants, who had prepared the client's financial statements, had blatantly misrepresented the client's financial position, overstating its earnings by approximately $600,000 and failing to state that the client was probably insolvent, and "*identifie[d] shortcomings in the audit procedure alleged to amount to a reckless disregard of the true state of [the client's] financial condition*" (215 AD2d at 308 [emphasis added]). It added that the allegation was supported by the affidavit of a financial expert, and that a creditor's committee had identified "substantial discrepancies and misrepresentations" in the financial statements (*id.* at 306).

Accordingly, plaintiffs here need not, at this time, establish the truth of their allegations that Deloitte was aware of severe irregularities in RCI's financial statements resulting in misstatement of the corporation's net worth. They need only allege specific facts from which it is possible to infer defendant's knowledge of the falsity of its statements. This they have done.

In this procedural context, the court need not address Deloitte's contention that the financial statements were

accurate. On a motion addressed to the pleading, we do not evaluate whether plaintiffs' showing absolutely establishes that the financial statements were materially inaccurate. It is sufficient if plaintiffs allege, by specific, supported factual allegations, that the statements were materially inaccurate and that Deloitte knew it. These allegations may be disputed by contrary evidence at trial, but their weight should not be addressed here.

Nor is Deloitte correct in asserting that the foregoing allegations only support, at most, a claim of negligence. An auditor's failure to independently verify financial statements may give rise to a claim for fraud, especially where the auditor "had notice of particular circumstances raising doubts as to the veracity of the such information" (*Foothill Capital Corp. v Grant Thornton, L.L.P.*, 276 AD2d 437, 437).

As to the motion court's reasoning that the fraud claim must fail because it cannot be inferred that Deloitte made the misrepresentations with the specific intent to induce Houbigant's acts, the law does not require such specific intent for a fraud claim. Rather, the plaintiff must only allege facts from which it may be inferred that the defendant was aware that its misrepresentations would be reasonably relied upon by the plaintiff, not that the defendant intended to induce the particular acts of detrimental reliance ultimately undertaken by the plaintiff (*see Fidelity & Deposit Co. of Md. v Arthur Andersen & Co.*, 131 AD2d 308, 311; *In re JWP Inc. Sec. Litig.*, 928 F Supp 1239, 1274). This pleading requirement is satisfied by the allegation that Deloitte knew, from the contractual requirement that the licensees forward audited statements to Houbigant, that Houbigant was relying upon Deloitte's audits to assure itself that RCI was satisfying the requirements that it maintain a $10 million net worth and that the licensees remain solvent.

The foregoing allegations similarly support the cause of action claiming that Deloitte aided and abetted the alleged fraud by the individual "insider" defendants, as that cause of action merely requires that the defendant affirmatively assisted, concealed, or failed to act when required to do so, in order to enable others' acts of fraud to proceed.

Accordingly, the order of the Supreme Court, New York County (Richard Lowe, III, J.), entered April 12, 2002, which, in an action by plaintiff licensors against defendant accountant based on audit reports and financial statements that allegedly did not accurately reflect the financial condition of defendant's clients, insofar as appealed from, granted defendant's motion

to dismiss the complaint to the extent of dismissing the causes of action for fraud and aiding and abetting fraud, and denied the motion with respect to the cause of action for professional negligence, should be reversed, on the law, so as to dismiss the cause of action for professional negligence, and reinstate the fraud and aiding and abetting fraud causes of action against Deloitte.

NARDELLI, J.P., BUCKLEY, ELLERIN and MARLOW, JJ., concur.

Order, Supreme Court, New York County, entered April 12, 2002, reversed, on the law, so as to dismiss the cause of action for professional negligence, and reinstate the fraud causes of action against Deloitte & Touche LLP.