[871 NYS2d 68]

JOHN C. BRADDOCK et al., Appellants, v DAVID B. BRADDOCK et al., Respondents, et al., Defendants.

First Department, January 6, 2009

**APPEARANCES OF COUNSEL**

*Kostelanetz & Fink, LLP*, New York City (*Brian C. Wille* and *Usman Mohammad* of counsel), for appellants.

*Thompson & Knight LLP*, New York City (*Brian C. Dunning* and *Irene R. Dubowy* of counsel), for respondents.

**OPINION OF THE COURT**

Saxe, J.

Plaintiff John Braddock alleges that he was shockingly used and abused after placing his trust in his cousin, defendant David Braddock, who lured John to sacrifice his lucrative career and the opportunities available to him and to uproot his home, in order to provide, at a huge discount, the critical service of locating a major investor to fund an oil and gas exploration company that David was attempting to form. John asserts that his cousin David induced him to make these enormous sacrifices by falsely representing that they would essentially jointly own and run the company, Broad Oak Energy (Broad Oak). He asserts that after he resigned from his full-time position in a New York investment firm, moved with his wife to Dallas, and found the investor for the company—charging a fraction of his usual fee for his services as an investment banker—he was slowly forced out of the company, first being driven to accept a substantially reduced position with lesser salary, benefits and terms, and later being subjected to humiliating scorn and abusive conduct. Especially in light of the familial relationship, these allegations state causes of action for fraud, breach of fiduciary duty, and promissory estoppel.

On a motion to dismiss under CPLR 3211, the court must "accept the facts as alleged in the complaint as true, accord plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory" (*see Leon v Martinez*, 84 NY2d 83, 87-88 [1994]). Properly applied to the record before us, this standard requires that the foregoing causes of action be reinstated. To plead a claim for common-law fraudulent inducement, a plaintiff must assert the misrepresentation of a material fact, which was known by the defendant to be false and intended to be relied on when made, and that there was justifiable reliance and resulting injury (*see Gaidon v Guardian Life Ins. Co. of Am.*, 94 NY2d 330, 348 [1999]). The complaint here sufficiently sets forth these elements.

It is specifically alleged that David orally misrepresented to John that, once John raised the capital needed from an investor, he would be appointed to serve as the company's CFO and land manager, and he would be issued "founders' shares" giving him

equity interests in the company equal to half the allotment that David would receive as company chairman and CEO. In alleged reliance on these promises, John not only accepted a drastically reduced investment banking fee, but he also was thereafter persuaded by David to pay most of the senior executives' required capital investment from the commissions he would be entitled to receive on the closing of the investment. What is more, in mid-March of 2006, David used the same assurances to convince John to agree to use some of his investment banking fees to fund the payments that Broad Oak was obligated to pay at closing to another consultant, J. Barry Brokaw.

On March 31, 2006, immediately after the investor, Warburg Pincus, agreed to provide $150 million in start-up capital to Broad Oak, David cut off all contact with John. Eventually, when pressed, in conversations and then in an e-mail dated April 17, 2006, David informed John that he would not be made CFO or land manager, although he offered that John could still be employed in the position of landman, with the understanding that eventually he would become the company's land manager, at which point he would become entitled to receive the originally promised founders' shares. David asserted that these changes were at the insistence of Warburg Pincus, although it is important to recognize that the record before us does not definitively establish this assertion to be an indisputable fact. Since, by the time David surprised John with these reduced terms, John had left his home and employment, was unemployed and had discontinued all other pending investment banking transactions to work for Broad Oak, he was in no position to do anything but cooperate in an attempt to salvage something from his former expectations.

In his responsive April 17, 2006 e-mail, John acknowledged the validity of David's message earlier that day suggesting, inter alia, that John's "substantial financial management and investment banking skill do not transfer to the high level of Oil & Gas Accounting and land management skills that are required in a very small start-up company," and indicated his willingness to forgo the CFO position and accept for the moment a lesser position at a reduced salary and as an *"employee at-will*, subject to the same objective performance criteria as any other employee."

On May 16, 2006, when the closing with Warburg Pincus occurred, John signed a termination and fee payment agreement, which documented his previous agreements to satisfy the

company's payment obligations to Brokaw out of his reduced investment banking fees.

On that date, John was also presented with an employment agreement, and after two weeks of discussions with his cousin in which he attempted to reassure himself that he could count on David's new promises, John signed the employment agreement on May 30, 2006, accepting the position of landman as an at-will employee.

John states that after he began his employment as landman for Broad Oak, he began to experience mistreatment. He was refused access to company meetings and was intentionally embarrassed, mocked and threatened. Not long after he began in his new position, John was diagnosed with papillary carcinoma of the thyroid in early June, and on June 26, 2006, his thyroid was removed. While John asserts that initially this had no impact on his job performance, he also asserts that harassment about his condition and its treatment became an integral part of David's campaign to drive him from the company, using embarrassment and cruelty. When the stress began to take a toll on his health, John was granted a conditional medical leave of absence in October 2006. However, at the end of November 2006, Broad Oak terminated his employment on the ground that he had failed to provide the required medical information from his physician.

The foregoing allegations satisfy the particularity requirement for a fraud claim (CPLR 3016 [b]).

As to the element of justifiable reliance, it is not amenable to determination as a matter of law on this record and in this context. First, it must be emphasized that the issue is generally one of fact (*see Talansky v Schulman*, 2 AD3d 355, 361 [2003]).

"Whether a plaintiff can ultimately establish its allegations is not part of the calculus in determining a motion to dismiss" (*EBC I, Inc. v Goldman, Sachs & Co.*, 5 NY3d 11, 19 [2005]). Moreover, since David and John are cousins, John's reliance on David's good faith may be found to be reasonable even where it might not be reasonable in the context of an arm's length transaction with a stranger. Family members stand in a fiduciary relationship toward one another in a co-owned business venture (*see Venizelos v Oceania Mar. Agency*, 268 AD2d 291 [2000]; *see also Birnbaum v Birnbaum*, 73 NY2d 461 [1989]). A fiduciary relationship is

"founded upon trust or confidence reposed by one

person in the integrity and fidelity of another. It is said that the relationship exists in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in, and relies upon, another" (*Wende C. v United Methodist Church, N.Y. W. Area*, 6 AD3d 1047, 1055 [2004], *affd* 4 NY3d 293 [2005], *cert denied* 546 US 818 [2005]).

Under the circumstances alleged here, John had reason to believe that David would treat him, in their interaction, with good faith and integrity.

In assessing whether John's actions may be found to be reasonable, the question is not whether he *ultimately* understood that his cousin had lied to him, but whether he could have reasonably understood that his cousin was lying to him at the time when he *first* took actions in response to David's assurances. In other words, initially, did he reasonably rely on David's representations when he left his job, moved to Dallas, and accepted a drastically reduced investment banking fee, and thereafter, did he reasonably rely on David's further assurances when he agreed to pay Brokaw's fees out of his own commissions? These questions require fact-finding and therefore cannot be resolved in the context of a CPLR 3211 motion.

The dissent, relying on the classic definition of fraud as the misrepresentation of a *present* fact, reasons that John's claim of fraud was properly dismissed because it amounts to a promise to confer a benefit *in the future*, which is only actionable when the defendant had no intention of fulfilling the promise at the time it was given (*see Tribune Print. Co. v 263 Ninth Ave. Realty*, 57 NY2d 1038 [1982]; *Lanzi v Brooks*, 54 AD2d 1057, 1058 [1976], *affd* 43 NY2d 778 [1977]). The validity of this rule is not in dispute. But the issue here, whether David ever intended that his promises would be fulfilled, is one of fact that should not be determined on a CPLR 3211 motion. While an inference that the promisor never intended to fulfill his promise should not be based solely upon the assertion that the promise was not, in fact, fulfilled (*see Brown v Lockwood*, 76 AD2d 721, 732-733 [1980]; *Lanzi v Brooks*, 54 AD2d at 1058), we must recognize that a present intention not to fulfill a promise is generally inferred from surrounding circumstances, since people do not ordinarily acknowledge that they are lying.

In *Lanzi v Brooks*, the complaint "neither allege[d] that defendant falsely stated his future intentions at the time he purportedly made the . . . representation nor contain[ed] any factual assertions from which this conclusion [could] be drawn" (54 AD2d at 1058). Here, in contrast, the inference that David knew all along that he would not fulfill his promises to John may be drawn from the full range of the troubling series of events visited on John. Those events, viewed together, permit the conclusion that David conducted himself in bad faith, planning all along to take advantage of his cousin's trust in order to obtain from him, at a fraction of the usual cost, the crucial service of finding the necessary investor to provide the start-up capital, and that he planned that once the necessary investor was on board, he would remove John by degrees until he was excised from the company completely. David's assurances as to the structure of the new company and the roles each of them would play within that structure therefore may be found to have constituted "promises made with a present, but undisclosed intent not to perform them" (*see Schulman v Greenwich Assoc., LLC*, 52 AD3d 234 [2008] [internal quotation marks and citation omitted]), forming the basis for a claim of fraud.

The dissent also suggests that reliance on the alleged assurances was unreasonable as a matter of law because, given his lack of experience and the nature of the planned enterprise, John knew or should have known from the outset that in this type of venture he could not rely on assurances that he would be given the executive-level position to which he claims entitlement. The problem with this reasoning is that it fails to employ the correct standard to be used on a CPLR 3211 motion. Rather than assuming the truth of the factual allegations of the complaint and all possible inferences, the dissent's reasoning accepts defendants' view of the circumstances. For instance, the dissent asserts that John Braddock was "by reason of his own prior professional involvement in oil and gas ventures and his extensive familial connections to the industry, particularly well aware of the risks such ventures entailed," and that John must have understood that any investment "would almost certainly be conditioned upon a significant measure of control by the investor over the company's management, operations and finances," so that "no promise of high executive-level employment in the company, much less one involving an allocation of a substantial equity membership interest, could have reasonably been viewed as an 'assurance' or a 'guarantee.'" These and

similar assertions amount to findings of fact that are improper in the context of a CPLR 3211 motion (*see Wiener v Lazard Freres & Co.*, 241 AD2d 114, 120 [1998]).

Nor is it appropriate here to determine the issue of justifiable reliance as a matter of law by relying on the documents that John signed on behalf of himself and Broad Oak Advisors during the course of his association with David and Broad Oak Energy. Construing the allegations liberally, the documents that defendants offer should not be treated as conclusively establishing the absence of reasonable reliance. The lack of certainty in the engagement agreement, and the reduction in salary and terms of employment provided for in the subsequent written contracts, sometimes omitted and sometimes altered the earlier oral assurances and representations, but did not directly contradict them, which distinguishes this matter from such cases as *Societe Nationale d'Exploitation Industrielle des Tabacs et Allumettes v Salomon Bros. Intl.* (249 AD2d 232 [1998], *lv denied* 95 NY2d 762 [2000]).

Although the engagement agreement signed on February 28, 2006 did not promise John any particular position with the company or compensation but, rather, made provision for how terms would be reached *"if"* he became employed by Broad Oak Energy, nevertheless John had reason to retain his belief in David's oral assurances. David's conduct toward John during February and March 2006, in the process of forming the company, comported with David's promises and John's expectations, as the two men together attended numerous meetings with potential investors, presenting themselves as senior executives. Further, other documents supported that belief, including a March 2006 draft business plan for the proposed company that identifies John as "Partner, CFO and Land Manager," an April 6, 2006 term sheet that lists David and John as the company's "management team," and presentation materials for potential investors that similarly identified John as Broad Oak's "CFO & Land Manager."

Nor do the April 17, 2006 e-mail from John to his cousin and the subsequent agreements they entered into negate *as a matter of law* the frauds claimed here. John's recognition in that e-mail of his limitations and his willingness to accept, for the moment, lesser employment terms do not establish a lack of reasonable reliance on the original, earlier lies.

It is also inappropriate to rely on the reference in John's e-mail to "at will" employment to hold that *as a matter of law*

he could not have reasonably relied on his cousin David's alleged promises of a future executive position with Broad Oak. Not only are we unable to determine in this context whether John even understood the legal connotation of the term "at will," but indeed, the suggestion that he understood the term's meaning is undercut by his own use of the phrase "subject to . . . objective performance criteria" immediately after the term *"employee at will"* in the e-mail. The juxtaposition of the concept of evaluation of his work based on "objective performance criteria" with the phrase "employee at will," when the very concept of at-will employment is that there is no obligation for the employer to apply objective performance criteria, makes it doubtful that John understood exactly what he was agreeing to.

The subsequent agreements John entered into in May 2006, similarly, should not be relied on to justify dismissal of his complaint. The perpetration of the initial fraud had already been completed, and John had already suffered damage, before entering into these agreements. Only a waiver of *that claim* could extinguish it, and no such waiver is established by defendants. Proof of a waiver, of course, requires establishing "an intentional relinquishment of a known right" and should not be lightly presumed (*see S. & E. Motor Hire Corp. v New York Indem. Co.*, 255 NY 69, 72 [1930]; *Jumax Assoc. v 350 Cabrini Owners Corp.*, 46 AD3d 407 [2007]). No such intentional relinquishment by John of a known right of action is established by the record before us.

It should also be recalled that John asserts that David used *additional* fraudulent inducements to convince him to accept the provision of the May 16, 2006 agreement by which he would use his own fees and his allotment of founders' shares to fund what until then had been *defendants'* obligation to pay consultant J. Barry Brokaw. In particular, John asserts that David assured him that if he were willing to begin in the position of landman, he would ultimately achieve the position of land manager, with a stock interest commensurate with that which was originally promised. John asserts that he remained unaware of the falsity of those inducements at the time he executed the May 2006 documents.

The situation presented here should be distinguished from cases in which a plaintiff who was involved in a business deal claims that, in the original discussions of the deal, misrepresentations were made as to its terms but the falsity of those

representations was revealed by the time the deal was executed. In such cases, the ultimate terms of the deal, if agreed upon, are all that the plaintiff is entitled to, and he will not be permitted to seek damages based upon the original misrepresentations, because he did not rely on them in electing to go through with the deal (*see e.g. Chelsea, LLC v Seventh Chelsea Assoc.,* 304 AD2d 498 [2003]). Here, in contrast, John's subsequent execution of documents that fundamentally altered the originally promised terms of his position with the company was not merely an election to enter into the deal anyway. First of all, even before he executed the first of the agreements relied upon by defendants, the deal was essentially under way, at least on his part, in that he had already sacrificed his former life and undertaken tasks to forward the venture, and he was no longer in a position to reject the offered terms or even to negotiate effectively. Indeed, when the allegations are understood in the context of an ongoing attempt by John to salvage something from his dashed expectations, the fact that he subsequently acceded to new and lesser terms should not justify holding *as a matter of law* that he did not reasonably rely on his cousin's alleged misrepresentations and false assurances, to his own severe detriment.

If all these interactions had been between strangers conducting an arm's length business transaction, strict reliance on the signed written documents, to the exclusion of the parties' words and conduct, would be appropriate. But the expectation of the good faith of a family member in circumstances such as these may justify some reliance on assurances that are not incorporated into written documents drafted and executed later.

Indeed, this matter is strikingly similar to *Brunetti v Musallam* (11 AD3d 280 [2004]), in which this Court reversed a grant of summary judgment dismissing an action for breach of fiduciary duty and fraud. In *Brunetti*, the plaintiff claimed that the defendants, who had joined the company he originally founded, fraudulently induced him to sign an agreement divesting himself of 70% of his shares of the company and surrendering his employment rights by becoming an at-will employee, by falsely representing that a necessary investor had conditioned an investment of millions of dollars in the company upon his doing so. In reinstating the complaint, this Court explained that the issues of material misrepresentation and reasonable reliance were not subject to summary disposition and emphasized the relevance of the defendants' fiduciary obligation of good faith toward the plaintiff (11 AD3d at 281).

Here, as in *Brunetti*, the issues of material misrepresentation and reasonable reliance are not subject to summary disposition, and the fiduciary relationship between the parties, with its concomitant mutual obligation to act in good faith, makes John's reliance on David's assurances all the more reasonable.

The merger clauses in each agreement, stating that prior agreements were superseded and terminated, may preclude further reliance on the terms of those earlier agreements, but they cannot negate John's detrimental reliance on fundamental representations whose falsity had already created a colorable fraud claim by the time the new agreement was executed, unless that already existing claim was waived, and waiver was not established here. Nor should the merger clauses preclude the claim that, even as the new agreements were executed, David continued to lure John into cooperating through the use of false assurances that John would still, ultimately, acquire the originally contemplated level of ownership interest in Broad Oak Energy. As in *Brunetti* (*supra*), in appropriate circumstances, a subsequent contract changing the terms of a plaintiff's employment to that of an at-will employee with severely reduced position and benefits does not preclude a claim that the plaintiff was fraudulently induced into accepting the new terms.

In this context, the defense of ratification does not preclude the fraud claims as a matter of law (*see Girschowitch v DeLong*, 51 NYS2d 499 [1944]). While an act ratifying a contract after the discovery of fraud in the inducement may defeat the right to challenge that contract, a plaintiff may still bring an action for damages for the fraud unless such a claim has been waived. "Ratification of a contract after knowledge of fraud in the inducement thereof is no defense to an action for fraud and deceit unless there has been a waiver of the cause of action for damages itself" (60A NY Jur 2d, Fraud § 217, citing *Potts v Lambie*, 138 App Div 144 [1910]; *Clearview Concrete Prods. Corp. v S. Charles Gherardi, Inc.*, 88 AD2d 461 [1982]).

The case of *Agristor Leasing-II v Pangburn* (162 AD2d 960 [1990]) illustrates how the ratification defense works and why it should *not* be applied here. There, the defendant leased farming equipment, then claimed fraud because the leased equipment did not live up to the representations made about it; thereafter, the defendant entered into a payment deferral agreement excusing his default in payments and allowing him to continue using the leased equipment. The Court held that, by signing the defer-

ral agreement after acquiring knowledge of the claimed fraud, the defendant had affirmed the original agreement by accepting a benefit under it, i.e., the continued use of the equipment, and thus he was barred from challenging it on grounds of fraud (*id.* at 961).

Here, in contrast, the allegations indicate that the initial fraud—the one that induced John to give up his job, move to Dallas, and locate an investor, on the promise of a substantial interest in the company to be formed with that investment— was discovered in April 2006, and, by that time, the damage was done. John's subsequent acceptance of the terms of the employment agreement did not amount to an acceptance of anything under the prior agreement that would constitute an implicit affirmance or ratification of that contract that he entered into before he acquired knowledge of the fraud; indeed, nothing that John did or agreed to after learning of that initial fraud amounted to anything except an attempt to salvage something from a devastating setback.

The *Brunetti* matter reminds us that even when the plaintiff signs a document changing the terms of his employment, the ratification defense may not be determined as a matter of law if there are factual issues as to whether the plaintiff knew he had been misinformed when he signed the later document (11 AD3d 280). Certainly, here, John's acquiescence to the reduced employment terms that he claims he was virtually forced to accept cannot serve to preclude his fraud claims as a matter of law without fact-finding as to what actually occurred.

Not only are the allegations sufficient to permit John's claim of fraud to proceed, they also are sufficient to make out the elements of a claim for promissory estoppel—"a clear and unambiguous promise, reasonable and foreseeable reliance by the party to whom the promise is made, and an injury sustained in reliance on that promise" (*see Williams v Eason*, 49 AD3d 866, 868 [2008]). Here, too, the agreements that John executed should not be read, in the context of a motion pursuant to CPLR 3211, to invalidate *as a matter of law* his claim of injury sustained in reasonable reliance on David's promises.

Further, in view of the nature of the claimed relationship and circumstances here, we should not be determining as a matter of law whether John has a viable cause of action for breach of fiduciary duty.

The cause of action for imposition of a constructive trust is based upon John's claimed right to the founders' shares

originally promised to him and any profits earned as a consequence of defendants' alleged wrongful possession of those shares. Since John alleged that he contributed a portion of his investment banking fees and contributed time and energy to the creation of the company in reliance on David's promise that he would receive a specified ownership interest in it, dismissal of this claim was improper (*see Ferguson v Murphy*, 273 AD2d 34 [2000]; *Matter of Urdang*, 304 AD2d 586, 587 [2003]).

■ However, the allegations fail to support a viable cause of action for constructive discharge. Although we have declined to use the May 16, 2006 agreement, in which John agreed to being an at-will employee, as a ground for rejecting his claim of justifiable reliance as a matter of law and thereby rejecting the fraud claim, his execution of that agreement, including the at-will term, precludes a claim for constructive discharge, regardless of any claimed lack of understanding of the agreement. Moreover, the allegations do not support a claim that his discharge was based upon his illness, which John offers as an alternative ground for the constructive discharge claim. We therefore affirm the motion court's ruling that the cause of action for constructive discharge must be dismissed.

John's claims for declaratory relief must be reinstated, except for the ninth and tenth causes of action, which rely on the substantive claim of constructive discharge.

Accordingly, the order, Supreme Court, New York County (Marylin Diamond, J.), entered October 17, 2007, which granted defendants' motion to dismiss the complaint for failure to state a cause of action, should be modified, on the law, the motion denied in part so as to reinstate the first, second, third, seventh, eighth and eleventh causes of action, and otherwise affirmed, without costs.

LIPPMAN, P.J. (dissenting). It is alleged that in early 2005 plaintiff John Braddock (John), then a successful Wall Street investment banker, was approached by his cousin, defendant David Braddock (David), with a business proposition. David, described in the complaint as a former "mud logger"[1] whose career in oil and gas exploration had been "decidedly mixed," had, despite the notorious failure of one of his earlier oil and gas ventures, resolved to reenter the entrepreneurial arena. He wished to form an oil and gas exploration company to tap

---

1. "Mud loggers" use bore samples to record and chart geological subsurface conditions in connection with hydrocarbon exploration.

"unconventional" oil and gas reserves situated in northern Louisiana and Texas by means of "horizontal drilling," a technique that had only recently become economically viable by reason of very high, indeed unprecedented, global oil and gas prices. The proposed venture, to be known as Broad Oak Energy, Inc. (BOE), was, however, wholly uncapitalized, and David hoped that John, with his experience in finance, might be instrumental in securing the $75 million to $150 million investment thought necessary for the venture's launch. John eventually agreed to provide the sought investment banking services, and to do so at a significantly reduced fee, but allegedly premised his agreement upon David's assurances that he would be employed by BOE as its chief financial officer and land manager and that he would receive half as many founders' shares in the company as were to be issued to David, who himself proposed to serve as the company's chief executive officer. By the end of February 2006, John, acting through his wholly owned investment banking and advisory services company, plaintiff Broad Oak Advisors, LLC (BOA), had identified several interested investors and, although a financing commitment had not yet been obtained, felt confident of securing the investment necessary to BOE's viability. On February 27, 2006, he resigned from his New York position, and the next day, well in advance of his eventual relocation from New York to Texas, where BOE's offices were to be situated, executed an engagement agreement, by which he "formally accepted" what is characterized in the complaint as "the fee arrangement earlier agreed to with his cousin."

It is not disputed that John was never employed or compensated in accordance with David's alleged initial oral assurances. John, however, does not seek damages for breach of promise, either on the basis of David's oral assurances or based upon the parties' subsequent written agreements, but rather would recover in tort, most notably for fraud. It is, in essence, alleged that John's entire course of conduct in providing investment banking services for a discounted fee, giving up his lucrative New York employment as an investment banker and advisor, moving to Texas and agreeing to take the nonexecutive position with BOE from which he was eventually dismissed in November 2006, was induced by David's above-described assurances. The complaint, however, does not adequately state a claim for fraud and, indeed, it is clear from the documentary evidence submitted by defendants in support of that branch of their motion seeking dismissal of the complaint pursuant to CPLR 3211 (a) (1) that plaintiffs have no cause of action for fraud.

A claim for fraud is necessarily premised upon an intentional misrepresentation of present fact (*New York Univ. v Continental Ins. Co.*, 87 NY2d 308, 318 [1995]). Accordingly, fraud is not stated when the representation sued upon amounts to no more than a promise to confer a benefit or assume a detriment in the future (*Adams v Clark*, 239 NY 403, 410 [1925]; *Brown v Lockwood*, 76 AD2d 721, 731 [1980]). The cases, however, recognize that an assurance given as to a future benefit or detriment may furnish a basis for recovery on a fraud theory where the assurance constitutes a deliberate misrepresentation of the defendant's present intention, i.e., where the defendant at the time of giving the assurance intends that it will not be fulfilled (*see e.g. Tribune Print. Co. v 263 Ninth Ave. Realty*, 57 NY2d 1038 [1982]; *Lanzi v Brooks*, 54 AD2d 1057, 1058 [1976], *affd* 43 NY2d 778 [1977]; *Adams v Gillig*, 199 NY 314, 320-321 [1910]). It is thus the defendant's contemporaneous harboring of an intention contrary to his or her represented promise that will potentially elevate what would otherwise be a claim based upon a promise, sounding simply in contract, to one based upon a misrepresentation of fact, sounding in fraud. Essential to the statement of a fraud claim premised upon a purported promise, then, are factual allegations from which the misrepresentation of an inconsistent present intention can be inferred (*Lanzi*, 54 AD2d at 1058; *Adams v Clark*, 239 NY at 410), and it is clear that the required inference is not permissibly drawn simply from the circumstance that the promise or assurance ultimately was not made good upon (*Brown v Lockwood*, 76 AD2d at 732-733; *Lanzi*, 54 AD2d at 1058).

This complaint is utterly devoid of any factual allegation permitting the inference that David, in representing to John that he would eventually become BOE's chief financial officer and land manager and receive a specified founders' equity interest in the company, falsely portrayed his contemporaneous intentions. While there is a conclusory allegation to that effect, the complaint does not specify any factual circumstance from which the requisite deliberate misrepresentation by David of his actual intention might permissibly be inferred. And, although plaintiffs contend that there is some dispensation from CPLR 3016 (b)'s requirement of specificity in pleading fraud when it comes to setting forth the element of intent or scienter, it is well established that what is properly no more than a claim for breach of promise may not be transformed into one for fraud by the mere addition of a perfunctory allegation that the promissor

did not intend to keep his or her promise (*see New York Univ.*, 87 NY2d at 318; *Rocanova v Equitable Life Assur. Socy. of U.S.*, 83 NY2d 603, 614 [1994]; *Eastman Kodak Co. v Roopak Enters.*, 202 AD2d 220, 222 [1994]; *Lanzi*, 54 AD2d at 1058). The cases, even while occasionally relaxing the rigorous statutory pleading requirements for fraud where it appears that a plaintiff has a claim but for good reason has been unable to articulate some relatively inaccessible circumstance of it in detail, consistently affirm the necessity of a pleading alleging facts from which each element of the tort can be made out (*see e.g. Kaufman v Cohen*, 307 AD2d 113, 120-121 [2003]; *Houbigant, Inc. v Deloitte & Touche*, 303 AD2d 92, 98 [2003]). While a mere failure to plead with the ordinarily required particularity may sometimes be excused, the utter failure to allege facts warranting an inference essential to establishing fraud comes within no recognized dispensation.

*Lanzi v Brooks* (54 AD2d 1057 [1976], *supra*) is instructive. There, as here, the claim for fraud was premised on a promissory representation and the complaint contained a conclusory allegation that the representation was made by the defendant with the intent to deceive the plaintiff (at 1058). In nonetheless dismissing the action for failure to state a claim, the Appellate Division observed in language resonant here as well:

> "Absent a present intent to deceive, a statement of future intentions, promises or expectations is not actionable on the grounds of fraud (*Adams v Clark*, 239 NY 403). A complaint based upon a statement of future intention must allege facts to show that the defendant, at the time the promissory representation was made, never intended to honor or act on his statement . . . Plaintiff's complaint neither alleges that defendant falsely stated his future intentions at the time he purportedly made the [complained-of representation] nor contains any factual assertions from which this conclusion can be drawn" (*id.*).

In affirming the dismissal on this ground, the Court of Appeals noted pointedly that its affirmance was predicated on the plaintiff's fundamental failure to "allege either a present intent not to carry out the promises of future action, or, in fact, any factual assertions from which this conclusion can be drawn," and not upon a possibly excusable failure to meet the exacting standard of particularity imposed by CPLR 3016 (b) (43 NY2d

778, 779, 780 [1977]). Here too, the dispositive issue is whether fraud is alleged at all, not whether, although otherwise adequately alleged, it is articulated in sufficient detail to pass CPLR 3016 (b) muster. Although this complaint, like the complaint in *Lanzi*, contains pro forma allegations of knowing misrepresentation, to the effect that David falsely represented his actual intentions when he gave the assurances now alleged to have been fraudulent, it does not state facts that, if proved, would permit a fact-finder reasonably to conclude that David's promissory representations, at the time of their making, did in fact falsify his then actual intentions, and thus it does not state a claim for fraud.

Fraud, a wrong bordering on criminality (*see Gaidon v Guardian Life Ins. Co. of Am.*, 94 NY2d 330, 348 [1999]), is, by design, not easily asserted, and it may be particularly difficult to plead where the present fact alleged to have been misrepresented is a subjective intention. Nonetheless, in a case such as this one, premised upon promissory representations, it is precisely the contemporaneous existence of the promisor's contrary subjective intent that marks his conduct as fraudulent and distinguishes it from the sort of conduct properly supportive of no more than a cause of action for breach of contract. It is then critically important that the empirical basis for the essential inference as to the existence of the promisor's contrary intention, the very "fact" alleged to have been misrepresented, be set forth clearly in the pleading. Otherwise, breach of promise would be routinely pleaded in the alternative as fraud and the essential distinctions between the causes impermissibly blurred.

While a mere pleading defect might be remediable, it is plain that the defect in plaintiffs' fraud claim is not confined to its articulation, but extends more profoundly to its merits. Defendants' submissions, taken together with the circumstances of the purported fraud, as alleged in the complaint, demonstrate conclusively that plaintiffs could not have reasonably relied on the alleged assurances and, accordingly, that they have no claim for fraud (*see Lanzi*, 54 AD2d at 1058; *and see Demov, Morris, Levin & Shein v Glantz*, 53 NY2d 553, 557-558 [1981]).

As noted, on February 28, 2006, John, through his wholly owned company BOA, entered into an engagement agreement pursuant to which the terms of his compensation for his investment banking services were formalized. The agreement, although not silent as to the matters covered by David's prior oral representations, i.e., John's contemplated employment with

and founders' equity interest in BOE, was altogether noncommittal on these issues, providing only that "[i]f [BOA] becomes employed by [BOE], [BOA] will be granted certain equity membership interests in [BOE] *as negotiated among the Parties at such time*" (emphasis added), and that

> "[i]f [BOA] does not become employed by [BOE], BOE will grant [BOA] a fractional percentage of [BOE's] equity membership interests *which is to be determined by [BOE], in its sole discretion*, based on the amount of [BOE's] equity membership interests held by [BOE], its officers and directors, *after the first Transaction* [i.e., BOE's initial financing], and based on the amount of contributed Equity Financing and Debt Financing capital accepted by [BOE] from investors on the Investor Contact List" (emphasis added).

The engagement agreement contained a merger clause stipulating that it was "the complete and exclusive statement of the Agreement and understanding of the Parties regarding the subject matter hereof, which supercedes and merges all prior proposals, agreements and understandings, oral and written, relating to the subject matter hereof."

In support of their motion, defendants also submitted e-mails exchanged on April 17, 2006, subsequent to BOE's receipt on March 31, 2006 of a $150 million funding commitment from the investment bank of Warburg Pincus LLC (Warburg) but prior to the closing of the financing transaction, which would take place on May 16, 2006. In the first of these e-mails, David wrote John,

> "As hard as you and I have worked to build a company where we could work together, it has become obvious to me, you, the other management members and Warburg that your substantial financial management and investment banking skills do not transfer to the high level of Oil & Gas Accounting and land management skills that are required in a very small start-up company . . .

> *"Let's find a way for us to gracefully close this endeavor and step apart"* (emphasis added).

John replied that the group concerns described by David were "rational and ha[d] merit" but that he nonetheless wished to continue his involvement in the venture. He proposed to do so on terms markedly different from those originally contemplated.

Specifically, he volunteered to "step back from the CFO role," to accept employment with BOE as a landman rather than a land manager; to accept a reduced salary and equity interest; and to serve the company as an at-will employee.

On May 16, 2006, at the closing of the BOE/Warburg funding transaction, John, individually and on behalf of BOA, entered into a termination and fee payment agreement. As is here relevant, that agreement, although stating categorically that "other than as set forth in this Agreement, BOA [and] J. Braddock . . . have no further right to any fee payments from BOE Corp or BOE LLC on account of the Engagement Agreements or any other agreement or arrangement regarding the provision of services by BOA [and] J. Braddock . . . to BOE," contained no provision entitling John or BOA to founders' shares in accordance with the alleged earlier representations by David.

Also on May 16, 2006, John was presented with an at-will employment agreement, which in its very first paragraph stated that it "supersede[d] all prior discussions regarding your employment with BOE." The terms of the agreement substantially conformed to those John had proposed in his April 17, 2006 e-mail, which is to say that they were dramatically at variance with David's alleged representations as to the nature of the positions John would fill at BOE. John executed the agreement on May 30, 2006, and pursuant thereto worked for BOE as a landman until his termination a half year later.

It should be clear that, subsequent to April 17, 2006, when in his e-mail David frankly apprised John of his wish to "close this endeavor and step apart," there could have been no reasonable basis for John's reliance on David's alleged prior assurances as to how the endeavor would unfold. Indeed, John, acknowledging that concerns over the adequacy of his skills in the areas of oil and gas accounting and land management were rational and possessed merit, plainly understood that David's "assurances" as to his assumption of executive responsibilities in those areas were no longer operative, and himself proposed, instead of serving the venture as its CFO and land manager, to be employed at will by BOE in the nonexecutive capacity of landman. He also volunteered, commensurate with the proposed reduction in his contemplated status, to accept a smaller allotment of founders' shares than he had been promised. The ensuing agreements entered into by plaintiffs, setting forth their significantly revised entitlement to compensation for their investment banking services, and the terms of John's at-will employment with BOE,

purport to govern their subject matters exclusively and are utterly inconsistent with the promises upon which John now claims to have relied. As such, they are preclusive of any legally tenable claim of reasonable reliance upon those promises (*see Citibank v Plapinger*, 66 NY2d 90, 95 [1985]; *Societe Nationale d'Exploitation Industrielle des Tabacs et Allumettes v Salomon Bros. Intl.*, 249 AD2d 232 [1998], *lv denied* 95 NY2d 762 [2000]; *Bango v Naughton*, 184 AD2d 961, 963 [1992]).

It is, nonetheless, urged that John may have been the victim of a fraud completed before the e-mails of April 17, 2006 and ensuing agreements. In this connection, it is noted that John resigned from the investment banking firm where he had been employed on February 27, 2006, and it is contended that, in taking this momentous step, he reasonably relied upon his cousin's assurances of executive employment and founders' shares in the start-up company. However, the engagement agreement, the provisions of which were undoubtedly known to John at the time of his resignation,[2] while explicitly addressing the subject of plaintiffs' eventual entitlement to an equity membership interest in BOE as an element of their compensation, conspicuously failed to provide any "assurance" that plaintiffs would receive the equity interest David had allegedly promised. In fact, far from providing an assurance of the promised interest, the agreement left the equity element of plaintiffs' compensation for subsequent determination, by negotiation if the "Advisor" became employed by the company, and by the company "in its sole discretion" if the "Advisor" was not so employed. The agreement thus expressly contemplated the possibility that BOA, or, practically speaking, John, would not be employed by BOE and, in any event, furnished no ground to suppose that David's unilateral promises would ultimately be honored by the company once it was funded and otherwise constituted. Indeed, the agreement is clear that hiring and compensation are prerogatives solely of the company, and it pointedly forbids reliance on "all prior proposals, agreements and understandings, oral and written, relating to the subject matter hereof," a reference which can only be understood as embracing with specific purpose the frequently reiterated promises of executive employment and compensation allegedly made by David to John in advance of the contract and at a time when the "company" had

---

**2.** Although John tendered his resignation one day before executing the engagement agreement, the agreement is alleged merely to have formalized what had been previously agreed upon.

no actual existential dimension. Accordingly, because plaintiffs "in the plainest language announced and stipulated that [they were] not relying on any representations as to the very matter as to which [they] now claim[ ] [they were] defrauded," their fraud claim must fail (*Danann Realty Corp. v Harris*, 5 NY2d 317, 320 [1959]).

Of course, the failure of the engagement agreement to include assurances of the sort allegedly given by David was a reflection of—indeed, was dictated by—the circumstance that no such assurances could then be reliably given. At the time of David's nominal assurances, BOE was but an unfunded shell requiring for its viability an enormous infusion of capital. And, while John was confident of procuring financing for the venture, there had been, at the time, neither a commitment of funds nor even the emergence of a leading candidate to provide such a commitment. Moreover, John, in addition to being an experienced investment banker and financial consultant, was, by reason of his own prior professional involvement in oil and gas ventures and his extensive familial connections to the industry, particularly well aware of the risks such ventures entailed. Indeed, his own cousin and prospective coventurer, David, had suffered a conspicuous failure in one such endeavor, in the aftermath of which, according to the complaint, he had been forced from the industry for several years. It is inconceivable that, with his vast fund of personal and professional experience and expertise, John did not understand that any substantial investment in the proposed venture, a high-risk start-up exploration company seeking to tap "unconventional" oil and gas reserves, would almost certainly be conditioned upon a significant measure of control by the investor over the company's management, operations and finances. In these circumstances, rife with uncertainty over the still inchoate entity's very viability, no promise of high executive-level employment in the company, much less one involving an allocation of a substantial equity membership interest, could reasonably have been viewed as an "assurance" or a "guarantee." As John must, and in any event should, have understood, the promise by David to appoint him, his cousin, to key executive positions for which he was by his own admission not particularly well qualified would almost certainly invite scrutiny by the "company" in its post-financing incarnation. The reality was that David simply was not in a

position to assure that his promises to John would be kept by the company, and, as noted, the engagement agreement, far from encouraging any misperception on that account, clearly reserved to the company the authority to determine whether John would ultimately be employed and the terms of his compensation. Had David's "promises" been the stuff of which binding, reliable commitments could have been made, there is every reason to suppose that John would have insisted upon their inclusion in the engagement agreement, since their fulfillment was, from John's perspective, essential to justify the discounted investment banking fees formalized by the agreement. That they were not so included would point ineluctably, even in the absence of the agreement's merger provision specifically forbidding reliance on "all prior proposals, agreements and understandings, oral and written, relating to the subject matter [t]hereof," to the conclusion that John understood, at the time, that what he now terms "assurances" and "guarantees" could have been reasonably understood as only as expressions of expectation or intent, the realization of which would depend upon contingencies not within the power of the parties to foreseeably accommodate to their stated objectives.

None of the objective circumstances compelling the conclusion that John could not, in electing to terminate his employment on February 27, 2006, reasonably take assurance from David's promises was hidden from or misrepresented to him, and, indeed, the fraud he alleges does not involve their concealment. Rather, he alleges, albeit inadequately, that David concealed his intention not to act in accordance with his promises. But the alleged concealment, even if it had occurred, would not change the essential calculus. What John did know and what he contemporaneously represented is more than sufficient to defeat his present claim of reasonable reliance. While he may have had a moral claim to rely upon his cousin even when objective circumstances counseled otherwise, there is no legal right to recovery in fraud that may be vindicated upon such a predicate.

Accordingly, I would affirm the dismissal of plaintiffs' fraud cause of action, and, in light of the nonviability of their claim of reasonable reliance, would affirm as well the dismissal of plaintiffs' cause alleging promissory estoppel, and their cause for breach of fiduciary duty, which, as alleged, also depends

upon the reasonableness of plaintiffs' reliance upon the complained-of misrepresentations.

Sweeny and Acosta, JJ., concur with Saxe, J.; Lippman, P.J., and Friedman, J., dissent in a separate opinion by Lippman, P.J.

Order, Supreme Court, New York County, entered October 17, 2007, modified, on the law, defendants' motion to dismiss the complaint denied in part so as to reinstate the first, second, third, seventh, eighth and eleventh causes of action, and otherwise affirmed, without costs.